PEOPLE v WIDGREN

1. CRIMINAL LAW—INSTRUCTIONS TO JURY—INSANITY—CONSEQUENCES OF VERDICT.

Instructions to the jury were proper where the judge expanded upon the consequences of a verdict of not guilty by reason of insanity by informing the jury not only that such a verdict would mean that the defendant would be confined to a mental institution but also that if certain conditions were met he would be released; such an instruction satisfies the requirement of providing the jury with accurate information concerning the consequences of such a verdict.

2. CRIMINAL LAW—INSANITY—WITNESSES—EVIDENCE—PSYCHIATRIC TESTIMONY—COMPETENCY REPORT.

Permitting a prosecution's psychiatric expert to testify after he had been afforded access to the forensic psychiatric report concerning a defendant's competency to stand trial, although case law holds that no psychiatrist who testifies at trial may base his opinion to any degree upon such a report, was proper where the psychiatrist had examined the defendant four months prior to seeing the report, and there was no indication that he used the report as a basis for his expert opinion.

3. KIDNAPPING—INSTRUCTIONS TO JURY—ELEMENTS OF OFFENSE.

Instructions on kidnapping were proper where it was charged that "mere movement of the victim does not constitute kidnapping" and that such movement must be "independent of the intended crime"; such an instruction conveys the correct standard to be applied in determining whether there was an asportation of the victim.

4. CRIMINAL LAW—JURY VERDICT—INCONSISTENT VERDICTS—STATUTES —KIDNAPPING—MURDER—EVIDENCE.

Jury verdicts finding a defendant guilty of kidnapping and sec-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 53 Am Jur, Trial § 803.
[3] 1 Am Jur 2d, Abduction and Kidnapping §§ 11–23.
[4] 21 Am Jur 2d, Criminal Law § 118.
[5] 53 Am Jur, Trial §§ 666, 667.
[6] 21 Am Jur 2d, Criminal Law §§ 540, 592, 614.

ond-degree murder are not reversibly inconsistent, although the murder statute provides that a murder committed in the perpetration of a kidnapping shall be murder of the first degree, where the testimony and documentary evidence would support a jury conclusion that the kidnap-murder victim was not murdered until after the kidnapping had ended (MCLA 750.316).

5. CRIMINAL LAW—DEFENSES—INTOXICATION—INSTRUCTIONS TO JURY —GENERAL INTENT—SPECIFIC INTENT.

A jury instruction concerning intoxication as a defense was erroneous where the judge discussed the concept of specific intent, but did not define specific intent, did not draw a distinction between specific and general intent, and did not tell the jury which of the several offenses charged were specific intent crimes and which ones only required a general intent.

6. CRIMINAL LAW—SENTENCING—MINIMUM SENTENCE—MAXIMUM SENTENCE.

A sentence of 60 to 75 years for second-degree murder violates the two-thirds minimum sentence rule set out in a Supreme Court case; the rule applies even though the defendant was sentenced 19 days prior to the decision setting out the rule where his appeal was pending at the time and the issue was briefed during the pendency of the appeal.

Appeal from Wayne, Thomas J. Foley, J. Submitted Division 1 April 10, 1974, at Detroit. (Docket Nos. 15490, 15491, 15492.) Decided May 29, 1974.

Robert Widgren was convicted of second-degree murder, three counts of kidnapping, and two counts of assault with intent to do great bodily harm less than murder. Defendant appeals. Affirmed in part, reversed in part.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Luvenia D. Dockett,* Assistant Prosecuting Attorney, for the people.

*Dennis H. Benson,* Assistant State Appellate Defender, for defendant.

Before: J. H. GILLIS, P. J., and HOLBROOK and VAN VALKENBURG,* JJ.

J. H. GILLIS, P. J. The facts in this case are essentially undisputed. In the early morning hours of January 1, 1972 three young women, Kathleen Hannon, Debbie Perrin, and Debbie Hennessey were traveling in Miss Hannon's automobile in suburban Detroit. Near the intersection of Ford and Inkster Roads, the vehicle was stopped by the Garden City Police. Miss Hannon was issued a citation for speeding. Following the issuance of the ticket, the girls resumed their journey and were proceeding eastbound on Warren Road when they noticed a car behind them flashing its bright lights. Assuming that she was again being followed by a police car, Miss Hannon pulled off onto a side street. The other vehicle came to a halt behind her car. A man, later identified as defendant, then approached the Hannon vehicle and asked if he could help "fix" the ticket. After Miss Hannon replied, "No", defendant ordered the young women to slide over. Following another negative response, defendant drew a knife and repeated the order. This time the girls obeyed. Defendant then climbed into the car, apologized for frightening them and drove away. For the next 20–25 minutes he drove aimlessly through residential areas, talking casually with Miss Hannon in the process. Miss Hennessey then told defendant that she had to meet her sister at a restaurant at Ford and Telegraph Roads. He agreed to take her there.

When defendant got to within one block of

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Telegraph, he turned down a dimly lit side street. He apologized for making a wrong turn, but instead of turning around he stopped the car and ordered the three women to undress. Only Miss Hannon did so. When Miss Perrin and Miss Hennessey refused, defendant began stabbing them. Debbie Perrin was able to open the passenger door and she and Debbie Hennessey escaped. Defendant then drove off with Kathleen Hannon still inside. A short time later her body was discovered off Edward Hines Drive in Dearborn Heights. Miss Hennessey and Miss Perrin recovered from their injuries. Based on information obtained from them defendant was arrested later the same morning when he returned to pick up his car.

Defendant was charged with six criminal offenses in three separate informations: three counts of kidnapping, one count of first-degree felony murder and two counts of assault with intent to commit murder. In early April 1972, defendant was committed to the Center for Forensic Psychiatry in Ann Arbor for a determination of his competency to stand trial. He was found competent by the Center, and on May 9, 1972 a Wayne County Circuit Judge made the same determination. Defendant filed a notice of insanity defense on May 23, and a consolidated trial of the three cases commenced June 5, 1972. Defendant was convicted by a jury of three counts of kidnapping (MCLA 750.349; MSA 28.581); one count of second-degree murder (MCLA 750.317; MSA 28.549); and two counts of assault with intent to do great bodily harm less than murder (MCLA 750.84; MSA 28.279). He appeals all six convictions.

I

*The trial court's jury instruction regarding the*

*possible disposition of defendant on a verdict of not guilty by reason of insanity was proper.*

Upon defendant's request, a jury must be instructed on the consequences of a verdict of not guilty by reason of insanity. *People v Cole,* 382 Mich 695; 172 NW2d 354 (1969). Accordingly, the trial judge instructed the jury as follows:

"We have mentioned that the plea in this case by the defendant is one of insanity. I charge you that a verdict of not guilty by reason of insanity means that Mr. Widgren will be confined to a state hospital for criminally insane for the remainder of his natural life, or until such time as it is determined that he has recovered and would not be harmful to other persons or property.

"I further charge you, however, it is also the law that whether or not such a person has recovered his insanity *(sic)* can be questioned at any time by Writ of Habeas Corpus. Upon testimony by psychiatrists in open court that the defendant is then sane, such a finding can be entered by the court and the defendant released forthwith."

Defendant argues that this is an improper *Cole* charge. He contends it was error to inform the jury of the relatively simple procedure by which a person adjudged insane can obtain his release.

*Cole* adopted the rationale of *Lyles v United States,* 103 US App DC 22; 254 F2d 725 (1957):

" 'This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common

knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955 [69 Stat 710, DC Code § 24-301 (1951) (Supp 5)]. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts.' " *People v Cole, supra,* 719, 720; 172 NW2d 365, 366.

Thus, the goal of *Cole* is to provide the jury with accurate information concerning the consequences of a verdict of not guilty by reason of insanity. We think the charge here does exactly that. It informs the jury not only that a defendant found not guilty by reason of insanity will be confined to a mental institution, but also that if certain conditions are met he will be released. As the trial judge stated in response to defendant's objection, the charge "merely states both sides of the coin". To have informed the jury of only "one side of the coin", as defendant argues should have been done, would have been to give an inaccurate charge contrary to the policy of *Cole.* The trial judge's instruction was proper.

## II

*The trial court did not err in permitting the prosecution's psychiatric expert to testify at trial*

*after he had been afforded access to the Forensic Center's competency report.*

During direct examination of the psychiatrist by the prosecutor, the following colloquy occurred:

> "*Q.* After interviewing him, did you have any other material or facts prior to reaching a conclusion as to his mental state?
>
> "*A.* I had a report of the Forensic Center in Ann Arbor. Apparently he had been sent there."

Defendant argues that permitting this psychiatrist to have access to the Forensic Center report prior to his testimony violated the dictates of *People v Schneider,* 39 Mich App 342; 197 NW2d 539 (1972). *Schneider* held:

> "In the first place, the examining psychiatrist who signed the report of the forensic center should not even have been called as a witness in the case in chief. We disapprove the practice. It is to be discontinued in the trial courts.
>
> "In this case, once called, the psychiatrist was absolutely barred from basing his opinion to any degree on the report of the center. We cite no authority. None is needed." *Schneider, supra,* 345; 197 NW2d 540.

We note that the case at bar differs in one significant respect from *Schneider*—the psychiatrist here did not participate in the preparation of the forensic report. However, we don't think this factual distinction is dispositive of the issue before us. We read *Schneider* as holding that no psychiatrist who testifies at trial, be he the one who prepared the forensic report or not, may base his opinion "to any degree" on that report. We agree with that holding, and nothing we say here is intended to undercut it.

*Schneider* requires reliance. Unless a psychiatrist relies on the report in forming his opinion,

there is no violation of *Schneider*. Here there is no indication of any such reliance. The psychiatrist examined defendant February 10, 1972. He testified that he did not see the forensic report until a couple of days before his June 13, 1972 trial testimony. We think the only reasonable conclusion is that the psychiatrist's opinion was formulated well before he saw the forensic report. Moreover, the doctor testified only that he "had" the report in his file. There is no indication that he used the report as a basis for his expert opinion. We find no violation of the *Schneider* rule.

## III

*The trial judge's kidnapping instructions were not erroneous.*

Originally the trial court instructed the jury as follows:

"I further charge you that as members of the jury, before you may find the defendant guilty of the crime of kidnapping, the following elements should be proven beyond reasonable doubt, as that term will be defined for you subsequently; that the defendant acted wilfully, maliciously and without lawful authority.

"Maliciously can be defined as a wrongful act done intentionally or with evil intent. The existence of malice may be gathered from or inferred from what was done on the dates said. Two, that the defendant did forceably or secretly confine the complainant. In this case we have three.

"The third thing is confine within the State of Michigan, and, lastly, with the confinement against the will of the complainant."

Shortly after beginning their deliberations the jury asked for a clarification of the definition of kidnapping. The judge concluded his additional instructions saying:

"Further, I charge you any assault or crime, such as rape, involves some confinement, and the mere movement of the victim does not constitute kidnapping under the statute unless such movement substantially increases the risk of harm to the victim above and beyond and independent of the intended crime, which is assault."

Defendant argues that these instructions failed to adequately instruct the jury on the element of asportation.

In *People v Adams,* 34 Mich App 546; 192 NW2d 19 (1971), this Court held that kidnapping requires an asportation of the victim. Writing for the Court, Judge LEVIN set forth the requisites of asportation:

"We have concluded that under the kidnapping statute a movement of the victim does not constitute an asportation unless it has *significance independent* of the assault. And, unless the victim is removed from the environment where he is found, the consequences of the movement itself to the victim are not independently significant from the assault—the movement does not manifest the commission of a separate crime—and punishment for injury to the victim must be founded upon crimes other than kidnapping." *Adams, supra,* 568; 30. (Emphasis supplied.)

On appeal, our Supreme Court accepted only one-half of Judge LEVIN's two-prong asportation standard:

"Judge LEVIN for the Court of Appeals in an otherwise exemplary opinion adopted a two sentence standard for movement to constitute asportation sufficient to sustain kidnapping in the instant case. We agree with the first sentence although we stated it differently above. We do not agree with the second sentence nor believe it supported by the cases or reason. Part of the problem is a definition of 'environment'—in one sense you can change the environment of the smallest room

by intruding a criminal with a weapon, although in another sense it is still the same room. * * *

\* \* \*

"As above indicated we hold *the movement element must not be merely incidental* to the commission of a lesser underlying crime, *i.e.,* it must be incidental to the commission of the kidnapping." *People v Adams,* 389 Mich 222, 236; 205 NW2d 415, 421, 422 (1973).[1] (Emphasis supplied.)

Therefore, for movement to constitute asportation it must have, in the words of this Court, "significance independent" of the underlying crime, or must not be, in the words of our Supreme Court, "merely incidental" to the underlying crime. These are not magic words. They are simply the words used by two jurists to convey an idea. A jury instruction on asportation can be proper without resorting to either of these phrases as long as it conveys the correct standard. In the case at bar the trial judge instructed that "mere movement of the victim does not constitute kidnapping" and that such movement must be "independent of the intended crime". We think this captures the essence of the *Adams* asportation standard. The instruction was correct.

## IV

*Jury verdicts finding defendant guilty of kidnapping and second-degree murder are not reversibly inconsistent.*

Michigan requires consistency in criminal verdicts. Verdicts will be held reversibly inconsistent

---

[1] The case at bar was tried in June, 1972, several months before the Supreme Court's *Adams* decision. However, this Court has consistently applied *Adams* retroactively. *People v Nash,* 47 Mich App 371; 209 NW2d 432 (1973); *People v Ford,* 47 Mich App 420; 209 NW2d 507 (1973); *People v Leszczynski,* 49 Mich App 555; 212 NW2d 255 (1973).

if they cannot be explained on any rational basis. *People v Phillips*, 43 Mich App 581; 204 NW2d 250 (1972). Defendant contends there is no rational basis to support his convictions for the kidnapping and second-degree murder of Kathleen Hannon.

"All murder which shall be * * * committed in the perpetration, or attempt to perpetrate any * * * kidnapping, *shall be* murder of the first degree * * * ." (Emphasis supplied.) MCLA 750.316; MSA 28.548.
"All other kinds of murder shall be murder of the second degree * * * ." MCLA 750.317; MSA 28.549.

Defendant argues that this language *requires* a jury to return a verdict of first-degree murder if it determines the murder was committed in the course of a kidnapping. Defendant further argues that once the jury had found that he kidnapped Miss Hannon, then, on the facts of this case, they had to find that her murder occurred during the perpetration of the kidnapping. Therefore, the only consistent murder verdict was guilty of first-degree, there being no rational basis to support a conviction of second-degree.

We do not quarrel with the first part of defendant's argument. However, we cannot accept his assertion that Miss Hannon's murder could only have occurred during the kidnapping. We think the testimony and documentary evidence supports a jury conclusion that Miss Hannon was not murdered until after the kidnapping had ended.

Miss Hannon's body was found on a hilltop about 20–30 feet off Edward Hines Road. All the evidence indicates that she was assaulted and killed outside of her car, rather than killed in the car and then dragged to the hilltop. One rational explanation for the body's presence outside the car is that defendant freed his victim, then, changing

his mind, ran after her, caught and killed her. The plausibility of this course of events is seen when we examine other facts in the record.

From the time defendant first approached the Hannon vehicle, his criminal intentions seemed "on again, off again". After forcing his way into the car at knifepoint, he tossed the knife on the dashboard and apologized for frightening the girls. He then drove around aimlessly, talking casually with Miss Hannon. Having agreed to take Miss Hennessey to meet her sister, he proceeded to within a couple of blocks of the destination, then turned down a side street. He apologized for making a wrong turn, but then ordered the girls to undress. After stabbing Miss Hennessey and Miss Perrin for refusing to comply, he made no effort to stop them when they fled.

Additionally, evidence indicates that defendant had been drinking quite heavily and that he was slightly retarded. These facts make it even more likely that his strange behavior was the result of several brief abandonments of his criminal intent, rather than a part of an intricate criminal design. Consequently, we think a jury could fairly conclude that Kathleen Hannon was murdered not during the perpetration of the kidnapping, but rather after the kidnapping had ended. Therefore, there is a rational basis for the conviction of second-degree murder. The verdicts are not reversibly inconsistent. See *People v Carter,* 387 Mich 397; 197 NW2d 57 (1972).

## V

*The trial court's instructions concerning intoxication as a defense were erroneous.*

The trial judge instructed the jury:

"There has been some mention of drinking in this case. I therefore charge you a person who voluntarily puts himself in a state of intoxication is deemed to intend the consequences which actually result, the crime actually committed.

"Or, stated differently, voluntary intoxication may not be shown for the purpose of proving that the defendant did not entertain the general intent necessary to commit the crime. However, where the crime is one which involves a specific intent, in addition to the general intent to commit the crime the defendant was so intoxicated so as to be unable to entertain the specific intent, intoxication may be a defense at least as to that specific intent crime.

"However, if the defendant forms the specific intent requisite to the commission of a crime while he was sober, decided to commit the offense while sober, a different question is presented. If on the basis of the evidence you find the defendant had formed this intent while sober, intoxication would be entirely limiting as a defense to the crime."

At no point during its lengthy instructions did the trial court tell the jury which of the offenses charged were specific intent crimes and which ones only required a general intent. While the trial court did discuss the concept of intent, nowhere did it define "specific intent", or draw a distinction between specific and general intent.

Defendant contends this instruction is inadequate and mandates reversal of his two convictions of the specific intent crime of assault with intent to commit great bodily harm less than murder. We agree. The trial court has a duty to instruct the jury clearly and understandably. *People v Guillett,* 342 Mich 1; 69 NW2d 140 (1955); *People v Liggett,* 378 Mich 706; 148 NW2d 784 (1967). It failed to do that here.

" 'To tell a jury that intoxication is not a defense in one breath and in the next that it may negative specific

intent is to ask the jury to comprehend a distinction which takes considerable time for the trained legal mind to grasp and, once comprehended, defies rational explication. See fn 25 and accompanying text. Although a correct statement of the law, this portion of the instruction was confusing and misleading. "[T]he arcane jargon of the law should not be recited *in vacuo* but, rather, the law *pertinent* to the case should be related in a meaningful manner to the evidentiary facts of the case." *Hill v Harbor Steel & Supply Corporation,* 374 Mich 194, 208; 132 NW2d 54, 60 (1965).' " *People v Kelley,* 21 Mich App 612, 622 fn; 176 NW2d 435, 440 fn (1970).

## VI

*Defendant's 60–75 years sentence for second-degree murder must be reduced.*

Lastly, defendant contends that his sentence of 60–75 years for second-degree murder violates the two-thirds minimum sentence rule as set out in *People v Tanner,* 387 Mich 683; 199 NW2d 202 (1972).[2] We agree. While defendant's sentence was imposed 19 days before the *Tanner* decision, *Tanner* applies here because his appeal was pending as of the date of *Tanner,* and the issue was briefed during the pendency of the appeal. *People v Alvin Reed,* 43 Mich App 556; 204 NW2d 319 (1972). We therefore modify defendant's second-degree murder sentence to 50–75 years.

We have reviewed defendant's other assignments of error and find them without merit.

We affirm defendant's kidnapping convictions; we affirm his second-degree murder conviction, except as modified in VI above; we reverse his two convictions of assault with intent to commit great bodily harm less than murder.

All concurred.

---

[2] Defendant also challenges his 9–10 years sentence for assault with intent to commit great bodily harm less than murder. Since our decision here reverses those convictions, the issue is moot.