PEOPLE v SMYERS

Docket No. 55054. Submitted January 8, 1976 (Calendar No. 8).—
Decided December 21, 1976.

Archie Smyers and 12 others were convicted in Genesee Circuit
Court, Philip C. Elliott, J., of conspiring to break and enter
occupied dwellings and to receive and conceal stolen property.
The issue was whether Smyers participated in the conspiracy
primarily for himself or as an informant in an FBI investiga-
tion of a series of burglaries. The Court of Appeals, Bronson,
P. J., and Fitzgerald and O'Hara, JJ., affirmed (Docket Nos.
9710, 14007). Defendant appeals. *Held:*

The conviction is affirmed by an equally divided Court.
Justice Lindemer, with Justices Coleman and Ryan concurring,
wrote that:

1. One who is a government informer and only feigns partici-
pation in a criminal enterprise may not be a conspirator. It was
a question of fact whether the defendant was a willing party to
the conspiracy, and the jury's determination that the defendant
was a conspirator rather than a police informant is supported
by evidence of guilt beyond a reasonable doubt.

2. A dress found in the defendant's house was properly
admitted into evidence where it was connected to the conspir-
acy by testimony that the dress was a fruit of the burglaries
and intended as a gift for the defendant's wife. A stolen adding
machine found in the house was also properly admitted, al-
though it was not a fruit of the conspiracy, to test the defend-
ant's credibility, motive and intent where the defendant

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 902.
[2, 3] 13 Am Jur 2d, Burglary §§ 26, 66.
  30 Am Jur 2d, Evidence § 1150.
[4] 29 Am Jur 2d, Evidence § 289.
  30 Am Jur 2d, Evidence § 1129.
[5] 5 Am Jur 2d, Appeal and Error § 722.
[6–15] 16 Am Jur 2d, Conspiracy §§ 1, 38–40.
  21 Am Jur 2d, Criminal Law §§ 115 *et seq.,* 143–145.
  75 Am Jur 2d, Trial § 751.
[16] 75 Am Jur 2d, Trial § 608.

claimed to have reported the machine and the FBI denied receiving the report.

3. Remarks of the prosecutor in rebuttal argument which were invited responses to the closing argument of defense counsel are not basis for reversal.

Justice Levin, with whom Chief Justice Kavanagh and Justice Williams concurred, would reverse the conviction because:

(1) The instructions to the jury were erroneous in permitting the jury to treat as an unlawful profit or gain (a) the immunity from prosecution with which the law shields a feigned accomplice, and (b) the money paid the defendant by the FBI for his undercover activities. It is inconsistent with ordinary notions of fairness for law enforcement authorities to invite a person to become involved in a criminal enterprise and then charge him as a participant on the theory that he profited from his participation in expecting to be immunized from arrest and prosecution and in receiving compensation from the authorities for the activities they hired him to perform.

(2) The instructions were misleading in failing to inform the jury that if it concluded that Smyers was authorized to involve himself in the criminal enterprise as a "fence", his retention of proceeds of sales of stolen property reported to the FBI would not support a conviction. If the defendant was justified in believing he could retain such profits, retention was not improper; if that asserted belief was not justified, his duplicity in withholding from the FBI the proceeds of the sales he reported was neither related to nor furthered unlawfully the criminal enterprise he was charged with unlawfully joining. Whenever an undercover agent participates in criminal activity the result may be to encourage and assist law violators and advance the criminal enterprise in which they are engaged. Such encouragement and assistance, incident to the undercover agent's participation, gives rise to no criminal responsibility on his part.

(3) The instructions were misleading in failing to inform the jury that if it concluded that the defendant received stolen property not reported to the FBI, conviction would be warranted if the jury further concluded that the defendant joined in the far-flung conspiracy charged in the information, but not if it concluded that his criminal involvement was confined to a narrower conspiracy with the burglars with whom he dealt or did not amount to a conspiratorial agreement, constituting only the unlawful acts of receiving or concealing stolen property.

47 Mich App 61; 209 NW2d 281 (1973) affirmed.

DECISION OF THE COURT

1. CRIMINAL LAW—APPEAL AND ERROR—EQUALLY DIVIDED COURT.

A decision of the Court of Appeals affirming a defendant's conviction of conspiring to break and enter occupied dwellings and to receive and conceal stolen property, over the defense that the defendant was acting as an informant for law-enforcement officers, is affirmed by an equally divided Court.

FOR AFFIRMANCE

COLEMAN, LINDEMER, and RYAN, JJ.

2. CONSPIRACY—INFORMERS—INTENT.

*One who is a government informer and only feigns participation in a criminal enterprise may not be a conspirator; the informer's intent becomes a question of fact for the jury.*

3. CRIMINAL LAW—JURY—FINDINGS OF FACT.

*The jury is sole judge of the facts; a jury's determination of guilt cannot be upset where sufficient evidence to support a finding of guilt beyond a reasonable doubt is present.*

4. CONSPIRACY—BURGLARY—EVIDENCE.

*A dress seized in a defendant's house on authority of a properly issued search warrant was properly admitted as probative of a defendant's participation in a conspiracy to commit burglary where the dress was connected to the conspiracy by testimony that it was a fruit of one of the burglaries within the conspiracy and was provided to the defendant as a gift for his wife.*

5. CRIMINAL LAW—ARGUMENT OF COUNSEL—INVITED RESPONSE.

*Remarks of a prosecutor in rebuttal argument which were invited responses to the closing argument of defense counsel are not a basis for the defendant to seek reversal.*

FOR REVERSAL

KAVANAGH, C. J., and WILLIAMS and LEVIN, JJ.

6. CONSPIRACY—BREAKING AND ENTERING—RECEIVING OR CONCEALING STOLEN PROPERTY—INFORMANTS—PROFIT—GAIN—INSTRUCTIONS TO JURY.

*Instructions to a jury in a trial for conspiracy to break and enter occupied dwellings, and to receive or conceal stolen property, that the defendant, a paid FBI informant, should be convicted if he joined the continuing conspiracy to "profit" by its unlawful purpose but gave information to the government for "gain" and with the hope of protecting himself from criminal prosecution were erroneous in permitting the jury to treat as an unlawful "profit" or "gain" (1) the immunity from prosecution*

*with which the law shields a feigned accomplice, (2) the money paid by the FBI to the defendant for his undercover activities.*

7. CONSPIRACY—BREAKING AND ENTERING—RECEIVING OR CONCEALING STOLEN PROPERTY—INFORMANTS—INSTRUCTIONS TO JURY.

*Instructions to a jury in a trial for conspiracy to break and enter occupied dwellings, and to receive or conceal stolen property, were misleading in failing to inform the jury that if it concluded that the defendant, a paid FBI informant, was authorized to involve himself in the criminal enterprise as a "fence", his retention of fencing proceeds on sales reported to the FBI would not support a conviction.*

8. CONSPIRACY—BREAKING AND ENTERING—RECEIVING OR CONCEALING STOLEN PROPERTY—INFORMANTS.

*Instructions to a jury in a trial for conspiracy to break and enter occupied dwellings, and to receive or conceal stolen property, were misleading in failing to inform the jury that if it concluded that the defendant, a paid FBI informant, received stolen property not reported to the FBI, conviction would be warranted if the jury further concluded that the defendant joined in the far-flung conspiracy charged in the information, but not if it concluded that his criminal involvement was confined to a narrower conspiracy with the burglars with whom he dealt as an informant or did not amount to a conspiratorial agreement, constituting only acts of receiving or concealing stolen property.*

9. CONSPIRACY—GOVERNMENT AGENTS—INFORMANTS.

*One who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a conspirator.*

10. CRIMINAL LAW—GOVERNMENT AGENTS—INFORMANTS—FAIRNESS.

*It is inconsistent with ordinary notions of fairness for law enforcement authorities to invite a person to become involved in a criminal enterprise and then charge him as a participant on the theory that he profited from his participation in expecting to be immunized from arrest and prosecution and in receiving compensation from the authorities for the activities they hired him to perform.*

11. CRIMINAL LAW—AIDING AND ABETTING—GOVERNMENT AGENTS— INFORMANTS.

*Encouragement and assistance given to law violators incident to an undercover government agent's participation in criminal activity gives rise to no criminal responsibility.*

12. CONSPIRACY—ELEMENTS OF CRIME.

*The gist of the offense of conspiracy is the unlawful agreement with the requisite criminal intent.*

13. CONSPIRACY—UNLAWFUL AGREEMENT—PARTICIPATION—KNOWL-
EDGE.

*The evidence in a trial for conspiracy, to sustain a conviction, must disclose something further than participating in the offense which is the object of the conspiracy; although an express agreement need not be established, some undertaking to engage in the offenses which are the putative objective of the criminal plan must be established; there must be proof of the unlawful agreement, either express or implied, and participation with knowledge in the agreement.*

14. CONSPIRACY—PARTICIPATION—PRIOR CRIMES.

*A person joining a group should not be held for offenses prior to his entry, for he was not a party to the crime of conspiracy which was being committed before that time.*

15. CONSPIRACY—PERSONAL GUILT.

*Guilt remains individual and personal, even as respects conspiracies; it is not a matter of mass application.*

16. TRIAL—INSTRUCTIONS TO JURY.

*The arcane jargon of the law should not be recited* in vacuo *but, rather, the instructions to the jury should relate in a meaningful manner the law pertinent to the evidentiary facts of the case.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski;* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, *Donald A. Kuebler,* Chief, Appellate Division, and *Joel B. Saxe,* Senior Assistant Prosecuting Attorney, for the people.

*Milton R. Henry* for defendant.

LINDEMER, J. *(for affirmance).* Defendant and others were convicted after a jury trial of conspiracy contrary to MCLA 750.151; MSA 28.348. The conspiracy was to violate both the burglary statute, MCLA 750.110; MSA 28.305, and the receiving or concealing of stolen goods statute, MCLA

750.535; MSA 28.803. Defendant's conviction was affirmed by the Court of Appeals, 47 Mich App 61; 209 NW2d 281 (1973). We granted leave to appeal, 391 Mich 766 (1974).

It is uncontroverted that a great many burglaries took place in Genesee County from February through December of 1967. The Federal Bureau of Investigation became involved in investigation of the problem, and an FBI agent named Thiel asked defendant in October or November to become a paid informant. Defendant did apparently give information for pay to the authorities that led to the arrest of the two apparently principal burglars, Bolduc and Fralick. Whether defendant was working primarily for himself or as part of an FBI investigation was a key factual issue.

Defendant maintains that, as a matter of law, he may not be convicted of conspiracy since he was a government informer. One who is a government informer and only feigns participation in a criminal enterprise may not be a coconspirator. *People v Atley,* 392 Mich 298, 311–312; 220 NW2d 465 (1974). It becomes a question of fact. We find upon examination of the record that the trial judge properly instructed on the question for the jury:

> "The question really concerns the presence or absence of criminal intent, whether he was a government informer secretly bent upon frustrating the conspiracy while feigning or pretending to be a coconspirator, or whether he was a willing party to an illegal venture for gain who feigned being a government informer to avoid the consequences of his criminal activities with the persons he informed upon."

Defendant and prosecutor on appeal both state that trial testimony "clearly" establishes the respectively favored theory. Neither party is correct.

The questions of defendant's complicity and cooperation were vigorously litigated and submitted to the jury.

"In conducting this review the appellate court must remember that the jury is sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. *People v Mosden,* 381 Mich 506, 510; 164 NW2d 26 (1969)." *People v Palmer,* 392 Mich 370, 375; 220 NW2d 393 (1974).

The jury's determination that defendant was a coconspirator rather than a police informant cannot be upset where sufficient evidence to support a finding of guilt beyond a reasonable doubt is present. After reviewing the record we conclude that the people's proofs meet that standard. The jury's verdict must stand.

Defendant complains of the seizure and admission into evidence at trial of a certain dress. The search warrant which led to the discovery and seizure of the dress was based on an affidavit as to a conversation held six days prior to the execution of the warrant. The article sought was a dress and the affidavit in support stated that "the said white cocktail dress [is] for [Mrs. Smyers'] personal use and that the said dress is presently at the above-described home of [defendant]". There was reasonable cause to believe at the time the search warrant was issued that the dress was present in defendant's house. The finding of probable cause by the magistrate to issue a search warrant pursuant to MCLA 780.651–780.653; MSA 28.1259(1)–(3) does not appear to have been an abuse of discretion. *People v Dellabonda,* 265 Mich 486, 491; 251 NW 594 (1933). Since the dress was seized on authority of a properly issued search warrant,

defendant's arguments concerning the propriety of his arrest warrant become moot. The cocktail dress was connected up by testimony which, if believed, supported the theory that the dress was a fruit of one of the burglaries within the conspiracy and was provided to defendant by Fralick as a special present for Mrs. Smyers. The dress would be probative of defendant's participation in the conspiracy charged, and admission of the dress was not error.

The admission of a stolen adding machine seized from defendant's house under a valid search warrant and the cross-examination of defendant concerning that machine are also claimed as error. Agent Thiel had testified that defendant had said nothing about the adding machine, while defendant said he had properly reported it. Although the machine wasn't a fruit of the conspiracy, the trial court properly allowed cross-examination to test defendant's credibility, motive and intent. *People v Dellabonda, supra.* The admission of the machine was without error under the same rationale.

The lower court file in this case contains a handwritten "missing witness" instruction which was not given at trial. Defendant's brief does no more than state that failure to give this charge was reversible error. No charge is questioned, no argument is offered, no portion of the record is referenced, and no authority of any kind is cited. This issue is deemed abandoned on appeal. *People v George,* 375 Mich 262, 264; 134 NW2d 222 (1965).

Defendant finally contends that certain statements by the prosecuting attorney in rebuttal argument were prejudicially erroneous. To say that this trial at times became vigorous and heated would be an understatement. We are satisfied that the remarks of the prosecutor were invited response to the closing argument of defend-

ant's attorney, and will not reverse this case on the basis of any such remarks.

"Criminal trials are not basket luncheons, and we seem faintly to recall that in our experience opposing lawyers rarely if ever pelted each other with rose petals. In any case, counsel for defendants cannot on his side be allowed great latitude to goad and provoke adverse comment or criticism from the prosecutor and then seek a reversal because his strategy succeeded." *People v Allen,* 351 Mich 535, 544; 88 NW2d 433 (1958).

The Court of Appeals and the circuit court are affirmed.

Coleman and Ryan, JJ., concurred with Lindemer, J.

Levin, J. *(for reversal).* Archie Smyers, a police informant, was convicted of conspiracy to break and enter occupied dwellings and to receive or conceal stolen property—the conspiracy he was investigating as part of his undercover activities—on evidence tending to show that he had joined and profited from that criminal enterprise.

There had been a wave of several hundred burglaries in the Flint area, apparently the work of a group of thieves. The FBI became interested when it learned that guns, including machine guns, had been stolen, and asked Smyers, who had previously worked as a police informant, to obtain information.

Smyers learned the identity of two of the burglars, fenced stolen property for them and received a portion of the fencing proceeds, and ultimately supplied the FBI with information which resulted in their apprehension. He reported those sales to the FBI. He testified it was his understanding that

he was expected to involve himself in the criminal enterprise if necessary to obtain the desired information and that, in addition to the money he received from the FBI, he could retain as part of his compensation for his undercover work the portion of the fencing proceeds he received from the burglars.

After their arrest the burglars turned state's evidence, and Smyers was arrested. They testified that Smyers purchased and acquired on consignment additional stolen property; the people asserted that Smyers had unlawfully profited from the secret disposition of that property, the receipt and sale of which was not reported to the FBI. Smyers denied the receipt of stolen property not reported to the FBI.

The judge instructed the jury, over objection,[1] that it should acquit Smyers if it concluded that he feigned complicity and acted as an informant for the police throughout his association with the burglars but that he should be convicted if he joined the "continuing conspiracy charged to achieve its criminal purpose and to *profit* by those purposes but gave information to the government for *gain* and with a hope of protecting himself from criminal prosecution". (Emphasis supplied.)

The jury was instructed that it was the people's theory that Smyers had sought to profit from his participation in the criminal enterprise in three ways:

1) as an informant he would be immune from arrest and prosecution;

---

[1] The judge's instruction on feigned accomplices differed substantially from the instruction proposed by Smyers' counsel. The judge did not give a requested instruction to the effect that the jury should acquit Smyers if it concluded that he was not part of the conspiracy charged but rather was involved in a separate and distinct criminal combination. Smyers' counsel objected to the instructions given, including the portion of the instructions concerning Smyers' profiting from his involvement with the burglars.

Opinion by LEVIN, J.

2) he would profit from the money paid to him by law enforcement authorities;

3) as an active participant in the conspiracy he would profit from the portion of the money he kept for himself when stolen goods were sold.[2]

We would reverse because the instructions

---

[2] The judge instructed the jury:

"It is the theory of the people that defendant Smyers acted in a duo role in this matter, that is, that he was not only an informer for the police some of the time, but that he joined the conspiracy with criminal intent and for his own profit. The people contend that defendant Smyers sought to profit from his participation in the conspiracy in three ways:

"1, that as an informer he would immunize—I'm not reading that right—that as an informer he would be immunized from arrest and prosecution;

"2, that as an active participant in the conspiracy he would profit from that portion of the moneys he kept for himself when stolen goods were sold;

"And, 3, that he would further profit from the money paid to him by law enforcement authorities on the occasions where he did, in fact, inform.

"The people contend that defendant Smyers actually participated in the unlawful conspiracy charged.

"I charge you that if, after having heard all of the proofs in the case regarding the defendant Smyers' activities with the police, that he was feigning complicity and acting as an informer for the police throughout the period of his associations with any of the alleged conspirators, or if the people have not proved beyond a reasonable doubt and by substantial evidence that Archie Smyers was not feigning complicity in acting as an informer for the police throughout the period of his associations with any of the alleged conspirators, then, in either case, you must return a verdict in favor of Mr. Smyers of not guilty.

"On the other hand, I charge you that if Archie Smyers, with criminal intent, agreed with Jerry Bolduc or other conspirators to join the continuing conspiracy charged to achieve its criminal purpose and to profit by those purposes but gave information to the government for gain and with a hope of protecting himself from criminal prosecution, then you may find him guilty of the conspiracy.

"The question really concerns the presence or absence of criminal intent, whether he was a government informer, secretly bent upon frustrating the conspiracy while feigning or pretending to be a co-conspirator, or whether he was a willing party to an illegal venture for gain who feigned being a government informer to avoid the consequences of his criminal activities with the persons he informed upon."

—were erroneous in permitting the jury to treat as an unlawful "profit" or "gain"

i) the immunity from prosecution with which the law shields a feigned accomplice,

ii) the money paid Smyers by the FBI for his undercover activities;

—were misleading in failing to inform the jury that if it concluded that Smyers was authorized to involve himself in the criminal enterprise as a fence, his retention of fencing proceeds on sales reported to the FBI would not support a conviction. (If he was justified in believing he could retain such proceeds, retention was not improper; if that asserted belief was not justified, his duplicity in withholding from the FBI the proceeds of sales he reported was neither related to nor furthered unlawfully the criminal enterprise he was charged with unlawfully joining.);

—were misleading in failing to inform the jury that if it concluded Smyers received stolen property not reported to the FBI, conviction would be warranted if the jury further concluded that Smyers joined in the far-flung conspiracy charged in the information, but not if it concluded that his criminal involvement was confined to a narrower conspiracy with the burglars with whom he dealt or did not amount to a conspiratorial agreement, constituting only the unlawful acts of receiving or concealing stolen property.

I

The wave of several hundred burglaries began in February, 1967. In late October or early November, 1967 FBI agent Donald Thiel communicated with Smyers, who was employed at a large industrial plant, and had previously worked as a police informant. Thiel asked Smyers to provide him

with information concerning the identity of the thieves.

Thiel testified that he received money from the state police which he, in turn, paid to Smyers and also paid him money provided by the FBI. On the people's examination, Thiel said that he had only asked Smyers to obtain information and had not "authorized" him to commit burglaries or to buy and sell stolen property and that Smyers did not inform him that he had retained proceeds received on the sale of stolen property. On re-examination Thiel acknowledged that he might have "possibly" expected Smyers "to appear to be involved" in order to obtain the information. It is not contended that Thiel told Smyers to desist from further involvement when Smyers reported that he was fencing TV's.

Thiel testified that Smyers first began working for him in January, 1966. Smyers testified that he had worked for law enforcement agencies for a number of years. He named a member of the sheriff's department and five members of the Flint Police Department with whom he had worked. Smyers said that it was the "practice over a period of years" that he could retain proceeds. "If they asked me how much I made, I told them." He was not expected to remit such proceeds. None of the police officers named was called as a witness.

A mutual acquaintance introduced Smyers, as a person interested in buying some TV's, to Jerry Bolduc, one of the burglars.

Bolduc testified that the first meeting was in the last of October or sometime in November. Smyers purchased a TV, knowing it was stolen, and paid $150. He said he would like to buy some guns and more TV's. A few days to a week later Smyers met James Fralick, who worked with Bolduc, and paid

them $200 for a TV and took an outboard motor
he thought he might be able to "move". Bolduc
could not remember if Smyers ever paid for it.

Bolduc said he delivered to Smyers' home an-
other TV "along with some guns and other stuff"
in the first part of December. Fralick said that
within a week he and Bolduc received $200 for
that TV. Fralick also related a delivery on con-
signment to Smyers of two stolen musical instru-
ments and four or five guns for which Smyers
never paid.

Smyers denied the foregoing transactions. He
said that at the first meeting he told Bolduc he
didn't have any money with him but would get
back to Bolduc. The meeting occurred in late
November or the first of December, and he re-
ported to Thiel shortly after the meeting. At the
second meeting (with Fralick), a few days later,
there was a conversation regarding Smyers' inter-
est in buying guns and a color TV. Smyers, be-
cause of the FBI's concern, told Bolduc that he was
interested in machine guns, and learned that they
had been sold. Smyers was shown a diamond
watch he did not purchase. He said he also re-
ported this meeting to Thiel. He said he never
received guns or musical instruments.

While the testimony was conflicting regarding
what occurred at the first meetings, there was
substantial agreement regarding the subsequent
events.

In late November or early December, Bolduc
and Smyers delivered a TV to a music store in
Flint. Smyers said that the proprietor gave him
$200 in bills and $25 in change. He gave $200 to
Bolduc who said he could keep the change. Bolduc
confirmed that he received $200, but he and the
proprietor both testified that $300 had been paid.

Thiel corroborated Smyers' testimony that he had reported the delivery of a TV at the music store.

Around the first of December, a Magnavox color TV-record player-radio was delivered to Smyers and he was given a stolen white cocktail dress for his wife. Smyers testified that the Magnavox was delivered to a local union president, whom he named, and that he reported that delivery and the receipt of the cocktail dress to Thiel. Thiel testified that Smyers had reported delivery of a TV to the person named, but he did not recall Smyers mentioning a dress. He also testified that he was aware of the delivery of a Magnavox, but did not connect it with the union officer.

Fralick testified that sometime before the dress was delivered he mentioned to Smyers that he had seen Christmas presents at some of the homes they were burglarizing and Smyers responded affirmatively to the question whether he would like some for his family.

A few days later another TV was delivered to Smyers on the understanding he would try to sell it, and Bolduc said Smyers paid cash for a pistol. A short time later, Smyers obtained a customer for the TV, and he, Bolduc and Fralick delivered it in Owosso. The customer paid $250, of which Bolduc and Fralick received $200.

Returning from Owosso, Fralick suggested that "it's about time we break [Smyers] in" on the burglaries. Two or three burglaries were attempted in Corunna; Bolduc and Fralick essentially corroborated Smyers' testimony that he remained in the car at each house and interrupted the burglaries by reporting he had seen flashing lights in the neighborhood or a person standing at the window of the house. Smyers attempted to report these events to Thiel; when he could not

reach Thiel he called a Flint city detective, whom he identified by name, and gave the information to him.

The next day, December 11, he reached Thiel and reported what had occurred. Thiel said that Smyers reported three break-ins, and he recalled some discussion that the reason for the journey was the delivery of a TV.

Thiel said that he saw Smyers five or six times in the approximately six-week period between their first conversation and the one on December 11th when, following the three break-ins, Smyers for the first time gave Thiel the first names of the thieves, physical descriptions, Bolduc's address and telephone number, and the license numbers of the vehicles they operated.[3] Thiel communicated this information to the state police, resulting in the arrest of Bolduc and Fralick the next day while attempting a breaking and entering.

After Bolduc and Fralick were arrested, they said they met Smyers and asked him for payment on consigned merchandise; he responded that he didn't have any money and the merchandise was still out on consignment. Later, Smyers paid $50 to each of them. Smyers acknowledged the pay-

---

[3] The people stressed Thiel's testimony that Smyers did not identify Bolduc and Fralick by name until December 11. Thiel testified, however, that he saw Smyers five or six times during the period of Smyers' undercover activities and that during two conversations preceding the 11th, Smyers had reported that he was in communication with the burglars and that he had fenced stolen property. It must have been apparent to Thiel that Smyers knew the identity of the burglars; he did not claim that Smyers refused to disclose their names. It appears that, for whatever reason, he may have been content to wait until Smyers decided to disclose their identities.

Smyers testified that he believed Bolduc and Fralick were armed. He understandably would withdraw from further communication with Bolduc and Fralick after their identities were made known to avoid the physical danger of being present when the police might attempt to make an arrest. Indeed, Bolduc was shot and wounded by the police when he and Fralick were apprehended on December 12.

ments, adding that he owed them about $207 he had borrowed during the period of time he "was trying to gain their confidence".

## II

Smyers was a paid informant for the FBI. If Thiel had not solicited his assistance in identifying the persons responsible for the burglaries, he would not have been exposed to arrest and prosecution.

Neither Smyers' expectation of immunity from arrest and prosecution nor the money received from the state police and the FBI can properly be regarded as "profit" or "gain" from the criminal enterprise. "[I]t is * * * well-established that one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator."[4]

The law tolerates the use of undercover agents to ferret out law violators. Some are police officers; others, often with underworld connections, are engaged on an informal basis with widely varying arrangements for the payment of money or other compensation. It is inconsistent with ordinary notions of fairness for law enforcement authorities to invite a person to become involved in a criminal enterprise and then charge him as a participant on the theory that he profited from his participation in expecting to be immunized from arrest and prosecution and in receiving compensation from

[4] *United States v Chase,* 372 F2d 453, 459 (CA 4, 1967). *See People v Atley,* 392 Mich 298, 311; 220 NW2d 465 (1974); *Sears v United States,* 343 F2d 139, 142 (CA 5, 1965); *United States v Wray,* 8 F2d 429, 430 (ND Ga, 1925) *(dictum).*

"When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone." *Developments in the Law—Criminal Conspiracy,* 72 Harv L Rev 920, 926 (1959).

the authorities for the activities they hired him to perform.

The instructions were erroneous in stating that such expectation of immunity or compensation could be treated as "profit" or "gain" derived from the conspiracy charged.

## III

The evidence against Smyers fell into three categories: (a) his retention of fencing proceeds on sales of stolen TV's reported to the FBI; (b) the receipt of the stolen white cocktail dress, which was to be retained and not fenced;[5] (c) the alleged receipt, not reported to the FBI, of additional TV's and other property to be fenced.

### (a)

It was undisputed that Smyers had retained fencing proceeds received on the deliveries reported to the FBI, either $25 or $100 on one delivery, an undisclosed amount, if any, on the second, and $50 on the third delivery.

There was no significant testimonial conflict between Smyers, Bolduc and Fralick concerning the disposition of the TV's reported to the FBI; nor was there any direct conflict between Thiel's and Smyers' testimony. Thiel's statement that he had not "authorized" Smyers to become involved in criminal activity is qualified by his statement that he "possibly" expected Smyers "to appear to be

---

[5] An adding machine was seized at Smyers' home following his arrest. The adding machine was not, however, substantive evidence; it was not stolen in any of the burglaries and was not connected to the conspiracy charge. It had been stolen from a store and was received in evidence on rebuttal on the issue of credibility.

Smyers did not, as asserted in my colleague's opinion, claim that he had reported the receipt of the adding machine to Thiel.

involved" in order to obtain the desired information. Thiel's failure to tell Smyers to desist from further involvement when Smyers reported that he was fencing TV's supports Smyer's claim that he was justified in believing he was authorized to become so involved. No police officer was called to contradict Smyers' statement that for a number of years he had performed similar services as an informant for local law enforcement officers, whom he named, and that it was the practice he could retain fencing proceeds in addition to the monetary compensation he received from the authorities.

If the jury concluded that Smyers was justified in believing he could become involved in fencing operations, his retention of fencing proceeds on sales reported to the FBI would not support a conviction for the conspiracy charged, without regard to whether retention of proceeds was, as Smyers claimed, in accord with past practice. While the retention of proceeds without authorization might have been unlawful, it could not have affected the activities of the burglars (who were unaware of Smyers' undercover role and expected him to retain the proceeds) or furthered unlawfully the objectives of the conspiracy charged.

Whenever an undercover agent participates in criminal activity the result may be to encourage and assist law violators and advance the criminal enterprise in which they are engaged. Such encouragement and assistance, incident to the undercover agent's participation, gives rise to no criminal responsibility on his part.

There was compelling evidence that Smyers was justified in involving himself as a fence provided that he reported the sales to the FBI. The jury may well have disbelieved the assertions of the

admitted burglars, that Smyers received additional
TV's and stolen property which were not reported
to the FBI. It was most important, therefore, that
the jury be carefully instructed that if it concluded
Smyers was justified in involving himself as a
fence on sales reported to the FBI, his retention of
fencing proceeds, whether or not in accord with
past practice, would not support a conviction of
participation in the conspiracy charged.

### (b)

Smyers' receipt of the stolen dress was undis-
puted. He said he reported its receipt to Thiel at
the same time he reported the delivery of the
Magnavox which was stolen in the same burglary.
Thiel said he remembered the Magnavox but not
the dress. Even if the jury concluded that Smyers
did not report receipt of the dress and thereby
unlawfully received stolen property, it would not
follow that he was a co-conspirator. While the
corollary of that conclusion may be that he was
guilty of the offense of receiving or concealing
stolen property, the gist of the offense of conspir-
acy is the unlawful agreement with the requisite
criminal intent. The receipt and sale of stolen
property is not necessarily pursuant to an earlier
agreement or related to a larger criminal enter-
prise.[6]

Although an express agreement need not be
established,[7] *some undertaking* to engage in the

---

[6] *See Bollenbach v United States,* 326 US 607, 611; 66 S Ct 402; 90
L Ed 350 (1946); *Cleaver v United States,* 238 F2d 766, 770 (CA 10,
1956); *United States v Zeuli,* 137 F2d 845 (CA 2, 1943).

[7] *See People v Atley, supra.*

"Since the agreement is usually tacit, its proof is largely circum-
stantial, drawing upon inferences from the acts and circumstances
surrounding the course of dealings between the parties." Note, *Fal-
cone Revisited: The Criminality of Sales to an Illegal Enterprise,* 53
Colum L Rev 228 (1953).

offenses which are the putative objective of the criminal plan must be established.[8] To sustain a conviction for conspiracy, "the evidence must disclose something further than participating in the offense which is the object of the conspiracy; there must be proof of the unlawful agreement, either express or implied, and participation with knowledge in the agreement". *Dickerson v United States,* 18 F2d 887, 893 (CA 8, 1927).[9]

The people sought, through Fralick's testimony that Smyers had expressed an interest in receiving a stolen Christmas present, to establish that Smyers unlawfully joined in the conspiratorial agreement. The failure to instruct the jury that it could not implicate Smyers in the conspiracy on the strength of the receipt and retention of the stolen dress alone and that unless it believed Fralick and disbelieved Smyers he could not be convicted on this theory improperly exposed Smyers to conviction even if the jury disbelieved Fralick's testimony.

(c)

The principal evidence against Smyers was testi-

---

[8] *See United States v Klein,* 515 F2d 751, 755 (CA 3, 1975); *People v Nelson,* — Colo —; 539 P2d 477 (1975), reversing conspiracy convictions for insufficient evidence of an agreement. Similarly, *see United States v Spanos,* 462 F2d 1012 (CA 9, 1972); *United States v Vaught,* 485 F2d 320 (CA 4, 1973).

[9] *See also Davidson v United States,* 61 F2d 250, 254–255 (CA 8, 1932); *Linde v United States,* 13 F2d 59 (CA 8, 1926); *cf. Bell v United States,* 2 F2d 543, 544 (CA 8, 1924). "[P]roof of the substantive offense alone is not sufficient to establish the crime of conspiracy to commit such offense." *Gebardi v United States,* 57 F2d 617, 618 (CA 7, 1932) *(dictum) rev'd on other grounds,* 287 US 112; 53 S Ct 35; 77 L Ed 206 (1932); *United States v Heitler,* 274 F 401, 405 (ND Ill, 1921), *aff'd* 289 F 1021 (CA 7, 1923). "[T]he fact, alone, that two or more have committed the [substantive] crime charged is not sufficient to establish a prima facie case of conspiracy." *State v Carter,* 326 So 2d 848, 854 (La, 1975).

mony by Bolduc and Fralick that they had delivered to him additional TV's and other stolen property—not reported to the FBI—which he was to fence. Smyers denied receiving any stolen property not reported to the FBI. No property stolen in any of the burglaries, except the dress and the TV's reported to Thiel, was, after an extensive investigation, traced to Smyers. The instructions did not adequately apprise the jurors that their verdict depended on how they resolved the issue of credibility posed by Bolduc's and Fralick's testimony and Smyers' denials.

The jury should have been further instructed that even if it concluded that Smyers had received stolen property not reported to the FBI, it would not necessarily follow that he had become a coconspirator. The jury could nevertheless properly conclude that Smyers had not thereby joined the far-flung conspiracy charged in the information, that his criminal involvement was confined to a narrower conspiracy with the burglars with whom he dealt, or that the acts of receiving stolen property did not support a finding that he had entered into an agreement amounting to a conspiracy with the burglars. If the jury so concluded, conviction of the conspiracy charged would not have been justified, even though such a finding might have supported conviction for a narrower conspiracy or for receiving or concealing stolen property, offenses not charged. The instructions also failed to identify these issues for the jury's consideration.

## IV

Two rationales have been suggested for charging conspiracy where the substantive offense has been completed: first, that prosecutors need this additional weapon to reach the "kingpin" of a far-

reaching criminal enterprise who is insulated by tiers of lieutenants from the substantive offenses,[10] and second, that there is a "special danger incident to group activity".[11]

In prosecuting the "hub" of a far-reaching criminal enterprise it may well be necessary to introduce evidence of the activities of the "spokes" in order to establish the "hub's" role in the enterprise. To require a minor "spoke" to in effect defend against massive evidence of the operation of the entire wheel can, however, be highly prejudicial. See *Kotteakos v United States*, 328 US 750, 769–770; 66 S Ct 1239; 90 L Ed 1557 (1946).

Smyers, concededly a late entrant in the ongoing burglary ring, was a minor figure in the grand pattern of several hundred burglaries and sales of property worth tens of thousands of dollars. After being enlisted by Thiel, Smyers dealt with Bolduc and Fralick for not more than six

[10] *See* ALI Model Penal Code, § 5.03, Comments (Tentative Draft No. 10, 1960); *Developments, supra,* 72 Harv L Rev, pp 923–925; LaFave & Scott, Hornbook on Criminal Law, p 459.

[11] The "group danger" rationale for permitting separate punishment for conspiracy is summarized and questioned in Goldstein, *Conspiracy to Defraud the United States,* 68 Yale L J 405, 413–414 (1959):

"Building on the assumption that a group is more to be feared than individuals acting separately, courts concluded that a plan by two or more persons to commit crime brings with it an increased likelihood that: the participants will reinforce each other's determination to carry out the criminal object; the object will be successfully attained; the extent of the injury to society will be large; those who commit it will escape detection; and the group's planning will have a long-term educative effect on its members, with schooling in crime the result. * * * More likely, empirical investigation would disclose that there is as much reason to believe that a large number of participants will increase the prospect that the plan will be leaked as that it will be kept secret; or that the persons involved will share their uncertainties and dissuade each other as that each will stiffen the others' determination. Most probably, however, the factors ordinarily mentioned as warranting the crime of conspiracy would be found to add to the danger to be expected from a group in certain situations and not in others; the goals of the group and the personalities of its members would make any generalization unsafe * * * ."

weeks of the ten-month period during which the
ring operated.

The objective of the conspiracy was to burglarize
and sell property. That objective was achieved,
with ample evidence of the many burglaries and
subsequent sales available and introduced. Charg-
ing Smyers with conspiracy where the objectives
have been accomplished, and liability for substan-
tive offenses could be established, adds little except
to provide the people with procedural advantages
not otherwise available.

A "person joining a group should not be held for
offenses committed prior to his entry, for he was
not a party to the crime of conspiracy which was
being committed before that time".[12] "Guilt with
us remains individual and personal, even as re-
spects conspiracies. It is not a matter of mass
application." *Kotteakos v United States, supra,* p
772.

There were 12 trial days in a 22-day period; 49
witnesses testified in 63 appearances. Two defend-
ants were tried in addition to Smyers, a burglar
and a fence with whom he had no relationship.[13]
The testimony concerned the activities of dozens of
charged and uncharged co-conspirators and felons
in the commission of over 400, possibly as many as
600, burglaries extending over a ten-month period.

It was of critical importance, under the circum-
stances, that "the arcane jargon of the law should
not be recited *in vacuo* but, rather, the law perti-
nent to the case should be related in a meaningful
manner to the evidentiary facts of the case". *Hill v
Harbor Steel & Supply Corp,* 374 Mich 194, 208;

---

[12] *Developments, supra,* 72 Harv L Rev, p 929.

[13] Bolduc and Fralick pled guilty to reduced charges. Other persons
charged as co-conspirators pled guilty or nolo contendere to various
charges.

132 NW2d 54 (1965).[14] Absent careful instructions relating the law of conspiracy to the evidence against Smyers, the instructions facilitated a verdict of guilty on alternative grounds, some of which would not as a matter of law support a conviction for conspiracy.

We would reverse and remand for a new trial.

KAVANAGH, C. J., and WILLIAMS, J., concurred with LEVIN, J.

FITZGERALD, J., took no part in the decision of this case.

---

[14] *See, also, People v Guillett,* 342 Mich 1; 69 NW2d 140 (1955); *People v Liggett,* 378 Mich 706; 148 NW2d 784 (1967); *People v Widgren,* 53 Mich App 375, 387; 220 NW2d 130 (1974).