THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT WILLIAMS, Defendant-Appellant.

(No. 56987;

First District (4th Division)—September 26, 1973.

Downs, Haddix & Schwab, of Chicago, (Lance Haddix and Patrick D. McAnany, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and Alois F. Baliunas, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE BURMAN delivered the opinion of the court:

Defendant, Robert Williams, was indicted on charges of murder and intimidation. After a jury trial, he was found guilty of both charges. He was sentenced to serve twenty to thirty years in the penitentiary for murder and one to two years in the penitentiary for intimidation, the sentences to run concurrently.

On appeal, defendant contends (1) that the court erred in refusing to give a tendered defense instruction on the effect of intoxication on the criminal responsibility of defendant; (2) that certain statements made by defendant to the police were erroneously admitted in violation of *Miranda*; and (3) that it was error to try the charges of murder and intimidation together.

The record reveals that the defendant called the Chicago police in the early morning of May 3, 1971, reporting that his wife had been shot. Officer Raymond Reynolds testified that he arrived at the scene at approximately 4:45 A.M. Defendant told him that his wife had shot herself or that someone else had shot her. Officer Reynolds observed Mary Williams dead, sitting in a chair with a gun across her body. On cross-examination, Officer Reynolds stated that when he first saw the defendant, he was crying. The officer had to help him up the stairs, and the defendant fell once. The witness stated that he detected an odor of alcohol on defendant's breath. He also said that the defendant lost consciousness once and was shaken by the detectives to revive him.

Homicide Investigator Robert Smitka testified that he arrived at the scene at approximately 5:20 A.M. with his two partners. Defendant was asked what had transpired. He related that he had been drinking most of the day and evening. At approximately 4:00 A.M. he had called his wife from a tavern on the south side. His wife told him to come home immediately because something bad was going to happen. Defendant proceeded directly home. When he entered through the rear door, he

observed his wife sitting in the contour chair in the living room, dead.

Officer Smitka further stated that defendant was asked where the gun had come from which was lying on his wife's body. Defendant responded that he did not have any guns in the house. Investigator Smitka also testified that the officers made tests, with the gun and the victim in their original positions from which the officers concluded that the deceased could not have inflicted the wounds herself with that weapon because the gun was too long.

The witness stated that the defendant appeared to be under the influence of alcohol. On cross-examination, he further testified that he detected alcohol on defendant's breath and that defendant's eyes were glassy. He stated that defendant was coherent and never lost consciousness. At the police station, defendant fell asleep.

Irene Garlinghouse, who lived with defendant and his wife, testified that she was babysitting for their baby on the night in question. Defendant and his wife returned home at about 2:30 A.M. Defendant had an argument with his brother about a car battery. The witness stated that after his brother left, defendant and his wife began to argue. Defendant picked up a shot gun, pointed it at his wife, and asked the witness how she would like it if he killed his wife. At the time, Mary Williams was sitting on the couch, nursing the baby. Then defendant told his wife to put her mouth over the gun. She said, "Do I look like I'm crazy?" Defendant then told her to get up and leave the house. Mary said she did not want to leave and defendant shoved her. She fell on the floor and he kicked her and hit her on the head with the shotgun. Then defendant jerked her off the floor and shoved her to the chair. He stood there, pointing the gun at his wife, and again asked the witness how she would like it if he killed his wife. Then the gun went off.

Mrs. Garlinghouse further stated that after the gun went off defendant told her to leave. He said, "I'll make this look like a suicide." Defendant placed his deceased wife's hand on the trigger of the gun. Then he walked the witness to the bus station. On the way, he told her, "Don't burn me or I'll come back and I'll fix you, kill you." On cross-examination, Mrs. Garlinghouse testified that when defendant came home, he was drunk. She also stated, however, that he did not require support, was not falling over his feet, and was not mumbling his words or raising his voice.

Katie Williams testified that she was married to William Williams, the defendant's brother, and that she and her husband lived next door to defendant and his wife. She stated that she saw the defendant and his wife at a tavern on North Paulina on the evening in question. They all

left the tavern at about 2:00 A.M. She said she heard defendant and his wife arguing when they got home. Then she heard her husband and defendant arguing about a car battery. Sometime after that she heard a shot. On cross-examination Mrs. Williams stated that defendant and his wife arrived at the tavern just before closing. She said she saw defendant with a drink in his hand, but never saw him drinking it. She further stated that when defendant walked into the tavern he appeared to have been drinking a lot.

William Williams, defendant's brother, testified that he and defendant and his wife went to a tavern on Paulina at about 9:30 P.M. on the evening in question. Defendant and his wife left after five or ten minutes. Later the witness' wife came to the tavern. At about 1:30 A.M., defendant and his wife returned and defendant had a drink. The witness stated that defendant was "packing a pretty good load."

The defendant testified on his own behalf. He stated that he, his wife, and his brother went to a tavern at approximately 10:00 P.M. on the night in question, and had a few drinks. Then defendant and his wife went to another tavern, where they had two or three drinks and watched a show. After the show, defendant and his wife went back to pick up his brother. Defendant went in and ordered a drink. William Williams' wife had come and at closing time they all went home. When they got home, defendant said he and his brother argued about a car battery. Defendant stated that he went out to do some work on his car and to get his wife some cheeseburgers. When he returned home, he saw his wife sitting in a chair with her head down and a shotgun lying across her lap.

Defendant stated that Irene Garlinghouse was lying on the couch in the room where his deceased wife was. She got up and asked to go home, but defendant said it would be better if she stayed. He finally agreed to let her go. He asked her if she knew how it happened and she said "no." He gave her some change and she left. Defendant denied walking her to the bus. Then defendant called the police and told them that his wife had been shot. They asked if it was a suicide and he said he didn't know. One of the police officers who arrived on the scene asked where he kept his guns and he replied "in the closet." Defendant said that he was crying and that he passed out once at the apartment. He denied that he had shot his wife and denied that he had intimidated Irene Garlinghouse by threatening to physically injure her if she called the police.

■■ Defendant first contends that the court erred in refusing to instruct the jury on the effect of intoxication on the criminal responsibility of the

defendant. In order for voluntary intoxication to be a legal excuse, the condition of intoxication must be so extreme as to suspend all reason. (*People v. Rose*, 124 Ill.App.2d 447, 259 N.E.2d 393.) Merely being "drunk" or "intoxicated" is no defense. The condition must be such as to negative the requisite mental state for murder. *People v. Jones*, 107 Ill.App.2d 1, 247 N.E.2d 40.

Defendant maintains that where there is any evidence in the record tending to show that the accused was intoxicated at the time the crime was committed, an instruction on intoxication must be given. We think defendant misconstrues the law in this regard. A similar situation was presented in *People v. Gonzales*, 40 Ill.2d 233, 239 N.E.2d 783. In *Gonzales*, the defendant was convicted of murder. He argued that there was sufficient evidence in the record from which the jury could have found him to have been so intoxicated as to suspend his power of reason and that the trial court therefore erred in refusing to give an instruction on manslaughter. The defendant in *Gonzales* testified that on the evening in question he had consumed a considerable amount of liquor and had fallen asleep after the killing. The Court stated, however, that since the evidence clearly demonstrated that the killing was a murder, it was not error for the trial judge to refuse to give an instruction on manslaughter. Similarly, in *People v. Rivera*, 7 Ill.App.3d 983, 289 N.E.2d 36, although defendant's testimony established that he had consumed an unspecified volume of alcoholic beverages on the date in question, the appellate court held that the evidence did not tend to establish a state of intoxication and that the refusal of an instruction on intoxication was therefore proper.

■■ In the instant case, defendant testified that on the night of the crime, he and his wife stopped three times in taverns. They had a few drinks at the first two stops and ordered a drink at the third. Defendant's brother and sister-in-law were with defendant and his wife at one of the taverns, and defendant's brother testified that defendant was "packing a pretty good load." Although the evidence tends to establish that defendant had been drinking, that is not enough to require that an instruction on intoxication be given. There is nothing in the record to suggest that defendant was so intoxicated as to negate the requisite mental state for murder.

The record does not contain a single statement by defendant to the effect that he did not know what he was doing or did not intend to murder his wife. Instead, he gave the officers a detailed and coherent account of where he had been prior to coming home and discovering his wife dead. Although the arresting officers testified that they smelled

alcohol on defendant's breath and that he appeared to have been drinking, those facts in no way tend to establish that defendant was so intoxicated as to excuse the killing.

■■ We conclude that in the case at bar, there was insufficient evidence for a jury to reasonably find that defendant was so intoxicated at the time of the crime that he lacked the requisite mental state for murder. Under these circumstances, we believe it clear that the trial court did not abuse its discretion in refusing to give the tendered defense instruction on intoxication.

Defendant next contends that the trial court erred in admitting certain exculpatory statements made by the defendant to the police because the statements were taken in violation of *Miranda v. Arizona*, 384 U.S. 436. When Officer Reynolds arrived at the scene, he asked defendant what had happened. Defendant answered that his wife had shot herself or someone had shot her. Officer Smitka stated that defendant told him that he had been out drinking and that at about 4:00 A.M. he had called his wife from a southside tavern. Defendant said he returned home and discovered her dead. He also stated to Officer Smitka that he did not have any guns in the house.

The statements now objected to by the defendant were taken immediately after the arrival of the officers on the scene. It must be noted that defendant himself summoned the police. This fact supports the premise that this initial interview was noncustodial in nature, since the element of compulsion was lacking from the interview. Moreover, the police are not likely to assume initially that a person who summons the police is guilty. The defendant suggested the possibility of suicide and it seems reasonable to assume that suspicion did not focus on defendant until after the officers had tested the suicide theory and found it highly improbable.

■■ It seems to us that the statements made by the defendant were responses to general on-the-scene questioning by police as to facts surrounding the crime, of the type specifically expected from the coverage of *Miranda*. (*People v. Routt*, 100 Ill.App.2d 388, 241 N.E.2d 206.) Moreover, the circumstances surrounding the interview—i.e. the fact that it occurred immediately after the officers arrived at the scene and prior to suspicion focusing on the defendant—indicate that the interview was non-custodial in nature and consequently outside the scope of *Miranda*. We hold therefore that it was not error to admit the exculpatory statements made by defendant to the police.

Finally, defendant contends that it was error for the trial judge to refuse to sever the murder and intimidation charges for separate trials. It is argued that the joinder of the murder and intimidation counts for

trial was prejudicial to defendant and constituted reversible error. Illinois provides for the joinder of offenses in a single indictment if the offenses charged are part of the same comprehensive transaction. (Ill. Rev. Stat. 1971, ch. 38, par. 111—4.) The Code of Criminal Procedure also provides that the court may order two or more charges tried together if the offenses could have been joined in a single charge. (Ill. Rev. Stat. 1971, ch. 38, par. 114—7.)

In the instant case, defendant was indicted in a single indictment for murder and intimidation and was tried for the two offenses in a single trial. The evidence revealed that defendant murdered his wife and then intimidated Irene Garlinghouse by threatening to kill her if she told what had happened. The two crimes occurred in close proximity of time and clearly were part of the same comprehensive transaction.

■■ The decision whether to sever two charges for trial is for the discretion of the trial judge. (*People v. Tabet*, 402 Ill. 93, 83 N.E.2d 329, *cert. den.* 336 U.S. 970.) If it appears that a defendant will be prejudiced by a joinder of related prosecutions in a single trial, the court may order separate trials. (Ill. Rev. Stat. 1971, ch. 38, par. 114—8.) It has been held that an indictment could join separate offenses in eight separate counts where the offenses were based on the same comprehensive transaction, which occurred when defendant ran through a red traffic light, struck two women, increased speed and attempted to escape, was stopped by a police officer, and produced a false driver's license. (*People v. Mowen*, 109 Ill.App.2d 62, 248 N.E.2d 685.) In the instant case, we cannot see how the defendant could have been prejudiced by trying the two offenses together. Moreover, in his motion for severance the defense only argued that the murder and intimidation were not part of the same transaction. The trial judge was well within his discretion in denying the motion to sever.

The judgment of the Circuit Court will therefore be affirmed.

Affirmed.

ADESKO and DIERINGER, JJ., concur.