**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Michael Joe GULLETT,
Defendant–Appellant.**

No. 11720.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 16, 1980.

Douglas B. Kays, Springfield, for defendant–appellant.

John Ashcroft, Atty. Gen., Edward F. Downey, Asst. Atty. Gen., Trina Pohle, (appearing under Supreme Court Rule 13), Jefferson City, for plaintiff–respondent.

MAUS, Judge.

The defendant was charged and convicted of second–degree murder and sentenced to 30 years' imprisonment. His appeal presents for consideration the defense of voluntary intoxication as applicable to that charge and conviction. Section 562.076, RSMo 1978, V.A.M.S., of The Criminal Code

in part provides: A person who is in an intoxicated condition is criminally responsible for his conduct "unless such condition (1) Negatives the existence of the mental states of purpose or knowledge when such mental states are elements of the offense charged or of an included offense." As the defendant questions the sufficiency of the evidence to sustain his conviction, a summary of that evidence is required.

The 23–year old defendant, with his wife and child, lived in a house owned by his parents. However, when his wife and child left about six weeks before the homicide, the defendant started living in a shed located to the rear of the house. The shed was equipped as living quarters. For some time before the homicide the defendant "had a problem of hacking paint". On June 16, 1979, the victim, Ted Lahman, was visiting the defendant. During the day they drank some Ever Clear 190 proof grain alcohol and hacked some paint. As a neighbor described it, they "horsed around in the yard". The defendant wore a green helmet and carried a vacuum cleaner metal extension tube as if it were a gun and the two played soldier marching "hup, two, three, four" around the house. About 3:30 p. m. the two, the defendant riding a bicycle and Ted walking, left. They returned about 5:00 p. m. with Ted's father and went into the shed where they drank some more. The older man left and the defendant and Ted continued their horseplay in the yard with the defendant demonstrating to Ted defensive tactics with the vacuum cleaner tube. The defendant wouldn't let Ted play with the tube and referred to it as his "protector". Late in the afternoon the two disappeared into the shed.

About 9:30 p. m. Ted went to the home of the neighbor and asked her to talk to the defendant as the defendant was "whirling out". The neighbor declined and advised Ted to leave the defendant. There was evidence the two argued and about 10:30 p. m. Ted was back to use the neighbor's phone because the defendant had gone "berserk" and Ted wanted to get some help for him. The request to use the phone was refused and again Ted was advised to leave.

He didn't but returned to the shed. In a short period of time the neighbor heard three distinct thuds, "weird noises", "hollow sounds" that came from the direction of the shed. The neighbor next heard the defendant pounding on a car parked on or near the property of the defendant's parents. The car belonged to a guest of the neighbor's son. The defendant was then seen throwing things from the car. The neighbor called the police reporting the disturbance. The neighbor's husband, son and son's friend went to the car. Apparently a brief altercation ensued but abruptly ended when the friend threw the defendant over the trunk of the car. The defendant continued to protest the car being parked on his property and was doing so when the police officers arrived within a few minutes after they were called. During the discussion about the disturbance, the neighbor advised the officers they should check on Ted who had been seen in the shed. The defendant responded that Ted had left, he was gone. Nevertheless, an officer went to the shed where he found Ted's body. Ted had been brutally beaten to death with a ¾–inch iron pipe.

Concerning the defendant's mental condition, the neighbor related that for several days she had been concerned about the defendant's behavior. The defendant had been acting strangely: he threw rocks at her house and the police were called; he came to her house for plastic sacks and bags; he marched up and down the street and yard with his "protector" playing soldier; he barked at her dog and bit, "clamped on", the corner of his house; and he tried to pick a fight with her son. In referring to the defendant's condition on the night in question, she said: He was not completely out of his mind but did not really know what was going on around him; he wasn't sane; and that on June 16, he was no more intoxicated than usual, than what she had seen him during the week.

The defendant testified he had been high most of the week preceding the homicide. Concerning his hacking paint, he said "that was my own doing . . . as I enjoyed it". He

related that being high on paint was different than being intoxicated on liquor. He heard weird things, he had seen the devil and at first thought that was funny, but later became scared; he had had no sleep for three or four nights because he was scared someone would get him. He testified that he remembered the helmet, but did not remember acting like a soldier; he did not remember barking at the dog or biting the house. Concerning the homicide, he remembered he and Ted argued and Ted left but came back. After hearing the evidence, he did say he killed Ted and believed he hit him with the pipe. He did not specifically remember killing Ted, he had no motive to kill him and did not intend to kill him. When asked if he remembered hitting Ted he replied "no, I can't say that I do". He did remember standing in the room and realizing Ted was "hurt pretty bad". After sitting down for 10 or 15 minutes to figure out what happened, he went toward the neighbor's house, but saw the car and went over and started beating on it with his fists. He did remember a formal statement that he gave the next morning and the fact that he was not intoxicated at that time.

A clinical psychologist examined the defendant on July 12, 1979. He testified that hacking paint can cause rage. As a result of the examination, he found the defendant had an extremely mild disfunction of the brain in connection with the formation of entireties, which disfunction could have been caused from hacking paint. He was also of the opinion the defendant "faked" the personality portion of his test in an attempt to put himself in a bad light. The psychologist found no indication of mental illness.

An officer who arrived at the scene within minutes after the call testified that the defendant was shouting about the car and kept interrupting the officer's conversation with the neighbor. He observed the defendant was intoxicated, he swayed as he stood, his eyes were bloodshot and he spoke excitedly. However, he said the defendant was coherent and was readily understood. Without objection, the officer testified the defendant understood what was going on around him. The defendant did not respond to his question concerning the source of the blood on the defendant's socks. After the body was discovered, and the defendant was arrested, the defendant no longer argued about the car. The other officers who saw the defendant at that time or shortly thereafter described the defendant as "extremely high", "slightly high" and "intoxicated". They all testified the defendant was coherent, responsible, understandable and knew what was going on around him.

The defendant's basic point is that his conviction must be reversed because the state did not prove beyond a reasonable doubt that he was not so intoxicated he could not form a specific intent to kill. His argument is based upon § 562.076 of The Criminal Code, effective January 1, 1979, dealing with the defense of an intoxicated or drugged condition.[1] This section has not yet been construed by an appellate court of this state. However, it is apparent our courts will be confronted with this statute in an increasing number of cases. Therefore, even though it is not essential to the disposition of this issue, it is appropriate for this court to consider in depth the construction of this section.

Before the effectiveness of The Criminal Code in Missouri, voluntary intoxication was "not a defense to a criminal charge and that the rule does not even allow a jury to consider such intoxication on the issue of specific intent." *State v. Richardson*, 495 S.W.2d 435, 440 (Mo. banc 1973). That was the rule of the early common law. *State v.*

1. Section 552.010 provides "[t]he terms 'mental disease or defect' do not include alcoholism without psychosis or drug abuse without psychosis ...." The relationship between mental disease and defect and intoxication is discussed in *Barrett v. United States*, 377 A.2d 62 (D.C. App.1977); *State, Attorney For Twentieth Cir-* cuit v. McNally, 336 So.2d 713 (Fla.App.1976); *Jackson v. State*, 402 N.E.2d 947 (Ind.1980); *Anderson v. State*, 380 N.E.2d 606 (Ind.App. 1978); *Commonwealth v. Sheehan*, 5 Mass. App. 754, 370 N.E.2d 1021 (1977); *State v. Shipman*, 568 S.W.2d 947 (Mo.App.1978).

*Stasio*, 78 N.J. 467, 396 A.2d 1129 (1979). However, in the majority of jurisdictions exceptions to that rule developed. This development was probably triggered because of the severity of punishment for certain offenses. This is demonstrated by the fact the death penalty was frequently imposed for premeditated, deliberated murder and the early exceptions were based upon the proposition voluntary intoxication could prevent a defendant from forming that intent. *State v. Stasio*, supra. As a more lenient attitude toward crime and punishment emerged and less emphasis was placed upon individual responsibility, the availability of voluntary intoxication as a defense was expanded by decision and by statute. This expansion was based upon the asserted inability of an intoxicated defendant to form a required intent which was an element of a crime. Apparently to justify making such a defense available to those who committed otherwise criminal acts, often acts of atrocity, decisions were frequently premised upon statements disclaiming voluntary intoxication as a defense or mitigating factor. "To follow this approach would be tantamount to accepting intoxication as a mitigating factor. This, however, is far different from attempting to ascertain the presence of a state of mind required by the crime." *Commonwealth v. Graves*, 461 Pa. 118, 334 A.2d 661, 664–665 (1975). This rationalization, however, did not stand the test of critical analysis. " 'To tell a jury that intoxication is not a defense in one breath and in the next that it may negative specific intent is to ask the jury to comprehend a distinction which takes considerable time for the trained legal mind to grasp and, once comprehended, defies rational explication.' " *People v. Widgren*, 53 Mich.App. 375, 220 N.W.2d 130, 136–137 (1974). "It matters little that the majority regards such evidence as only bearing upon an element of the crime, the specific intent of the perpetrator, rather than serving as a

defense to such crime. The end result is the same and no amount of legal jargon will make it otherwise." *Commonwealth v. Graves*, supra, dissenting opinion at p. 667.

Some authorities take the position that voluntary intoxication may prevent the formation of a general intent as well as a specific intent and should constitute a full defense to a criminal charge.[2] This is to treat the defense of voluntary intoxication as co–extensive with disability arising from mental disease or defect. Such a result would seem to follow as an intent to do the physical act is an element of all crimes. "Yet the same logic and reasoning which impels exculpation due to the failure of specific intent to commit an offense would equally compel the same result when a general intent is an element of the offense." *State v. Stasio*, supra, 396 A.2d at 1133.

Nevertheless, restrictions have been maintained upon the defense of voluntary intoxication. The most common restriction has been that " 'voluntary intoxication may not be shown for the purpose of proving that the defendant did not entertain the general intent necessary to commit the crime. However, where the crime is one which involves a specific intent, in addition to the general intent to commit the crime the defendant was so intoxicated so as to be unable to entertain the specific intent, intoxication may be a defense at least as to that specific intent crime.' " *People v. Widgren*, supra, 220 N.W.2d at 136. Also see *Commonwealth v. Graves*, supra. In like manner, statutes in terms of authorizing the defense of voluntary intoxication when such intoxication negatives an element of the offense or similar terms, have generally been construed to be applicable only to offenses involving a "specific" as distinguished from a "general" intent. *State v. Crocker*, 387 A.2d 26 (Me.1978); *State v. Verhasselt*, 83 Wis.2d 647, 266 N.W.2d 342

---

**2.** "But since drinking alcoholic liquor is not usually followed by gross intoxication and such intoxication does not usually lead to the commission of serious injuries, it follows that persons who commit them while grossly intoxicated should not be punished unless, at the time of sobriety and the voluntary drinking, they had such prior experience as to anticipate their intoxication and that they would become dangerous in that condition." J. Hall, General Principles of Criminal Law, p. 556 (2nd ed. 1962).

(1978); *People v. Hunter*, 14 Ill.App.3d 879, 303 N.E.2d 482 (1973). The distinction between general intent and specific intent has not been clearly defined and is indeed difficult to draw. The application of this distinction has produced varying results. The following have been held to be offenses involving a specific intent: Felony murder, robbery and burglary, but, voluntary intoxication may not be incorporated into the test of provocation, *Commonwealth v. Graves*, supra; first and second–degree murder, *State v. Brant*, 252 S.E.2d 901 (W.Va.1979); intentional sexual contact, *State v. Crocker*, supra; setting a fire with the intent to damage or destroy the property, *State v. Barrett*, 408 A.2d 1273 (Me.1979); aggravated robbery, simple robbery and assault, *People v. Scheidt*, 186 Colo. 142, 526 P.2d 300 (1974); assault with intent to commit great bodily harm, *People v. Widgren*, supra; battery, *People v. Hayes*, 37 Ill.App.3d 772, 347 N.E.2d 327 (1976); committing lascivious acts upon 2½ year old child for purpose of satisfying sexual desires, *State v. Haines*, 259 N.W.2d 806 (Iowa 1977); rape, *People v. Morrison*, 58 A.D.2d 699, 396 N.Y.S.2d 92 (1977); knowingly and indecently handling a female under 16, *State v. Rayos*, 77 N.M. 204, 420 P.2d 314 (1967). The following have been held to involve only a general intent: atrocious assault and battery, *State v. Giberson*, 153 N.J.Super. 241, 379 A.2d 480 (1977); rape, *Cherry v. State*, 539 S.W.2d 51 (Tenn.Cr.App.1976); armed robbery, *People v. White*, 40 Ill. App.3d 455, 352 N.E.2d 243 (1976); second–degree murder, *State v. Tapia*, 81 N.M. 274, 466 P.2d 551 (1970); second–degree murder and felonious assault, *State v. Bunn*, 283 N.C. 444, 196 S.E.2d 777 (1973). Limitations have been placed upon such a defense as a matter of public policy. " 'While the authorities are not all agreed, the great weight thereof in this country is to the effect that mere intoxication cannot reduce murder to manslaughter.' " *Leaders v. State*, 92 Nev. 250, 548 P.2d 1374, 1375 (1976). Also see *State v. Hall*, 214 N.W.2d

205 (Iowa 1974); *Mock v. State*, 2 Md.App. 771, 237 A.2d 811 (1968); *State v. Sinclair, et al.*, 49 N.J. 525, 231 A.2d 565 (1967); *Claiborne v. State*, 555 S.W.2d 414 (Tenn.Cr. App.1977). Others have held such a defense is limited to reducing the degree of an offense. *McCarthy v. State*, 372 A.2d 180 (Del.1977); *Jewell v. Commonwealth*, 549 S.W.2d 807 (Ky.1977).

It was with this background § 562.076 was enacted as a part of The Criminal Code. That section reads as follows:

1. A person who is in an intoxicated or drugged condition whether from alcohol, drugs, or other substance, is criminally responsible for conduct unless such condition

(1) Negatives the existence of the mental states of purpose or knowledge when such mental states are elements of the offense charged or of an included offense; or

(2) Is involuntarily produced and deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct or to conform his conduct to the requirements of law.

2. The defendant shall have the burden of injecting the issue of intoxicated or drugged condition.

The meaning of the latter phrase and burden of proof on the issue are prescribed by § 556.051, which provides:

When the phrase 'The defendant shall have the burden of injecting the issue' is used in the code, it means

(1) The issue referred to is not submitted to the trier of fact unless supported by evidence; and

(2) If the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue.[3]

The terms, purpose and knowledge are defined in § 562.016:

---

**3.** It seems anomalous that in regard to the defenses of intoxication the burden is upon the state (§ 556.051) and in regard to the defenses of mental disease or defect (§ 552.030) or duress (§ 562.071) the burden is on the defendant.

2. A person "acts purposely", or with purpose, with respect to his conduct or to a result thereof when it is his conscious object to engage in that conduct or to cause that result.

3. A person "acts knowingly", or with knowledge,

(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

(2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

The scope of those terms is further defined in § 562.021 which provides:

3. If the definition of an offense prescribes criminal negligence as the culpable mental state, it is also established if a person acts purposely or knowingly or recklessly. When recklessness suffices to establish a culpable mental state, it is also established if a person acts purposely or knowingly. When acting knowingly suffices to establish a culpable mental state, it is also established if a person acts purposely.

Section 562.076(1) is difficult of construction and application. Perhaps this difficulty has been added to by the fact that § 562.076(1) represents such a departure from the principle of individual responsibility and accountability heretofore embodied in the law of Missouri. "This course thus undermines the criminal law's primary function of protecting society from the results of behavior that endangers the public safety. This should be our guide rather than concern with logical consistency in terms of any single theory of culpability . . . ." *State v. Stasio,* supra, 396 A.2d at 1134. There is a distinction between the accountability of those impaired by mental disease or defect and of those who voluntarily may impair their own facilities. *Pierce v. Turner,* 276 F.Supp. 289 (D.C.Utah 1967), *aff'd,* 402 F.2d 109 (10th Cir. 1968).

Nevertheless, § 562.076 has been adopted and must be construed and applied.[4] All acts, except involuntary reactions, are the result of a "conscious object to engage in that conduct", § 562.016.2, even though those acts may be directed by a mind befuddled by intoxication. Adopting that premise, and reading that section literally, it could be applied in respect to all offenses requiring a culpable mental state. However, the section is to be construed and applied in accordance with the intent of the legislature. As hereafter demonstrated, it was the intent of the legislature to limit the application of this section. A prime source for the determination of that intent is the comments of those who drafted the measure. The source of § 552.030(3)(1) was § 4.02(1) of the Model Penal Code. In construing § 552.030(3)(1), the Supreme Court en banc held "that when the General Assembly enacted § 4.02(1) of the new Missouri Act, it adopted the interpretation placed thereon in the commentary by the drafters of the model act." *State v. Anderson,* 515 S.W.2d 534, 539 (Mo. banc 1974).

Section 562.076 is declared to be based upon § 2.08 of the Model Penal Code. However, § 2.08 was not adopted verbatim as § 562.076. Further, § 562.076 was accompanied by the comments of those who labored hard and long to draft The Criminal Code. Therefore, in construing § 562.076 it is appropriate to consider the comments to both § 2.08 and § 562.076.

The comments to § 2.08 find the distinction between specific and general intent too obscure to provide a satisfactory basis for a determination of when the defense of voluntary intoxication is to be available. Those comments do not, however, disapprove the results of the decisions based upon those concepts. Rather, the results of those decisions were regarded as being embodied in § 2.08. Among those comments is the following:

When purpose or knowledge, as those culpability factors are defined in Section 2.02 of the Code, must be proved as an

4. The general subject is discussed in Voluntary Drug Intoxication as Defense, Annot., 73 A.L. R.3d 98 (1976), and Voluntary Intoxication as Defense, Annot., 8 A.L.R.3d 1236 (1966).

element of the offense, intoxication may be adduced in disproof if it is logically relevant. When, on the other hand, recklessness or negligence, as those culpability factors are defined in Section 2.02, suffices to establish the offense, an exculpation based upon intoxication is precluded by the law. And since recklessness at least is ordinarily sufficient for *mens rea*, intoxication ordinarily is not permitted to establish a defense, whatever its effect on the awareness or knowledge of the actor.

The following settled positions will illustrate these principles of the existing law:

(a) Evidence of intoxication may be employed to disprove premeditation and deliberation and thus to reduce murder from first to second degree—but not in most states to achieve a further reduction to manslaughter. The usual explanation that a 'general intent' suffices for common law murder or statutory murder in the second degree seems on analysis to mean that recklessness establishes the required kind of culpability, though it does not suffice for murder in the first degree.

(b) Evidence of intoxication may not be adduced on a charge of forcible rape to support a claim of mistaken belief in consent—presumably again because recklessness as to consent makes out sufficient culpability as to that element of the offense; the crime is said to be one that requires only 'general intent'.

. . . . .

(d) Evidence of intoxication may be adduced to disprove felonious intent in burglary or larceny or robbery. These are the clear cases where the definition of the crime requires a purpose ulterior to what the actor actually does; such purpose everywhere is viewed as a 'specific intent'. (Footnotes omitted)

As noted, § 562.076 does not precisely follow § 2.08. Many perhaps most, of the sections of The Criminal Code defining the

substantive elements of a criminal offense are couched in terms such as "he knowingly damages a building", § 569.040, or acts "with the purpose", § 570.030. Other sections contain no required state of mind. Section 562.076 does not expressly exclude offenses based upon a reckless state of mind as does § 2.08(2). Yet, the comments to The Criminal Code include the following statements. "The section is limited to negativing the mental states of purpose and knowledge. It does not apply to any crime that can be committed with recklessness or criminal diligence."[5] It is apparent § 562.-076 was drafted in correlation with the sections defining code offenses. If the section of The Criminal Code defining an offense prescribes a culpable mental state of acting purposely or knowingly, § 562.076 is applicable. If the section expressly prescribes a culpable mental state of acting recklessly, § 562.076 is not applicable. If the section defining an offense "does not expressly prescribe a culpable mental state, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly *or recklessly.*" § 562.021 (Emphasis Added). Since such an offense "can be committed with recklessness", § 562.076 does not apply. For example, § 566.030, defining the crime of rape, does not expressly prescribe a culpable mental state and can be committed with recklessness and § 562.076 does not apply. This reasoning does not coincide with human experience but comports with the reasoning underlying § 2.08 of the Model Penal Code upon which the verbal structure of that code is built. That verbal structure has been adopted by The Criminal Code. Such a result also is consistent with a realistic analysis upon the basis of the general—specific intent distinction.

By the terminology used in the definition of code offenses the legislature has determined to which code offenses § 562.076 shall be applied. However, not all criminal offenses are defined by the Code. Conven-

---

**5.** "It does not apply to a crime that can be committed recklessly." MAI–CR 3.30.1, Notes on Use.

tional second–degree murder is such an offense.[6] Nevertheless, "unless otherwise expressly provided or unless the context otherwise requires, the provisions of this code shall govern the construction of any such offenses committed after January 1, 1979, as well as the construction and application of any defense to a prosecution for such offenses." § 556.031.2.[7] However, the legislature has not by the terminology referred to above determined to which non–code offenses § 562.076 is applicable. That determination must be made upon the basis of the underlying policy expressed in the comment to § 562.076. That intent is expressed in two statements in those comments.

Subsection (1)(1) adopts the view of the vast majority of jurisdictions that where the crime requires that to be guilty the defendant must have had a specific mental state, evidence of his being intoxicated is admissible as bearing on whether he did in fact have that mental state.

. . . . .

The code section brings Missouri law on this point into line with that of nearly every other state and reaches a more logical result.

■ Therefore, as to non–code offenses, § 562.076 should be held applicable to those offenses that require a specific intent as distinguished from a general intent, and in line with the majority of other states. As previously noted, these terms have never yielded to a generally accepted definition. The most widely, expressly or impliedly accepted definitions are that general intent refers to the intent to do the act and specific intent refers to any other mental state or intent which is an element of the offense. The use of such definitions often results in decisions that defy logic. For example, a defendant has been held to be entitled to show that because of intoxication he did not have the intent to kill even though he shot his father in the chest with a .20–gauge shotgun, *Jewell v. Commonwealth*, supra, 549 S.W.2d 807; that he had no intent to commit great bodily harm even though he stabbed two young women with a knife, *People v. Widgren*, supra, 220 N.W.2d 130. Such results justifiably tend to expand the definition of general intent to include not only an intention to do the act, but also an intent to inflict the injury or produce whatever condition is almost certain to result from the act. However, as long as the test remains the mental elements of the offense, the submissibility of the defense should not be dependent on the nature of the act involved in a particular case.[8] When the issue of voluntary intoxication has been injected, the nature of the act involved and the consequences practically certain to result therefrom may be more appropriately considered in determining if the state has carried its burden in presenting evidence from which the jury could conclude that beyond a reasonable doubt the defendant formed the requisite intent.[9]

Section 552.030(3) (taken from § 4.02 of the Model Penal Code) deals with the defense of diminished capacity. That section provides that evidence concerning a mental disease or defect shall be admissible to prove the defendant did not have a state of mind "which is an element of the offense". That is substantially the language of Model Penal Code § 2.08 providing for the defense of voluntary intoxication and which has consistently been construed as having reference to a specific intent which is an element

---

**6.** "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree." § 565.004. The elements are defined in MAI–CR No. 15.14.

**7.** MAI–CR 17.00 Supplemental Notes on Use § 4. d. (3) g. so provides.

**8.** See summary in Annot., 8 A.L.R.3d 1236 (1966).

**9.** The rule that voluntary intoxication is no defense to a crime involving a general intent, which is in essence embodied in § 562.076.1, is based upon the proposition that a defendant, regardless of the state of his intoxication, is held to have intended to do the physical act. While the principle is not necessary to the disposition of this case, should not evidence of the act support a conclusion that a defendant intended the consequences practically certain to have resulted therefrom?

of an offense. Hence, it might seem the application of the defense of voluntary intoxication would parallel the application of the defense of partial capacity. This is not necessarily the case. First, in neither the Model Penal Code nor The Criminal Code is the defense of diminished capacity made inapplicable to an offense that can be committed with recklessness or criminal negligence as is the case with the defense of voluntary intoxication. Second, the comments accompanying the two provisions when enacted by the legislature are vastly different.

In *State v. Anderson,* supra, 515 S.W.2d 534, it was held that § 552.030(3) is applicable to negative the element of premeditation, an intent to kill, and that diminished capacity is a defense to second–degree murder. However, that decision is not necessarily controlling concerning the defense of voluntary intoxication. As reflected in the comment to § 562.076, the intent of that section is to bring Missouri in line with the majority of states. In a majority of states, as a matter of construction of specific intent or as a matter of policy, voluntary intoxication is not a defense to second–degree murder. Further, the concept of § 562.076 was drawn from the Model Penal Code. As demonstrated in the comment to § 2.08 quoted above, it was not the intent of the Model Penal Code to make voluntary intoxication a defense to second–degree murder. This is clearly established by the fact that under the Model Penal Code voluntary intoxication is not a defense when recklessness establishes an element of the offense. Model Penal Code § 210.2 provides that criminal homicide may constitute murder when it is committed recklessly under circumstances manifesting extreme indifference to the value of human life.[10] With this background, it would seem it was not the intent of the legislature to make voluntary intoxication a defense to second–degree murder.

However, it is not necessary to decide the defendant's first point on that basis. The trial court believed the defense to be applicable and gave MAI–CR 3.30.1[11] with an appropriate cross reference as paragraph Fourth in MAI–CR 15.14. The defendant's first point will be decided upon the basis of whether or not there is sufficient evidence to support the determination of the jury that beyond a reasonable doubt his voluntary intoxication did not negative the defendant's state of mind of an intent to kill.

■ Section 562.076 does not mean that because an intent is the product of an intoxicated mind that such intoxication is a defense. It is not every degree of intoxication that is a defense. "The 'intoxicated or drugged condition' to which the statute refers is not the condition of alcohol–induced incandescence or being well–lit that lowers the threshold of inhibition or stirs the impulse to criminal adventures. It is that degree of complete drunkenness which makes a person incapable of forming intent to perform an act or commit a crime." *State v. Guiden,* 46 Wis.2d 328, 174 N.W.2d 488, 490 (1970).

The test for measuring the required condition has been expressed in many ways. "[U]nless he is so intoxicated that he is utterly devoid of consciousness or awareness of what he is doing", *State v. Masqua,* 210 Kan. 419, 502 P.2d 728, 733 (1972); "utterly incapable", *State v. Bunn,* supra, 196 S.E.2d at 786; *State v. Guiden,* supra, 174 N.W.2d at 490; "when there is demonstrated a *total* lack of capacity such that the bodily machine completely fails", *State v. Brant,* supra, 252 S.E.2d at 904; " 'incapable of entertaining the specific mental intent' ", *Mock v. State,* supra, 237 A.2d at 813; "the condition of intoxication must be so extreme as to suspend all reason", *People*

---

**10.** This provision and its effect upon the defense of voluntary intoxication is noted in *Commonwealth v. Ingram,* 440 Pa. 239, 270 A.2d 190 (1970). Also see *State v. Giberson,* 153 N.J.Super. 241, 379 A.2d 480 (1977). For a contrary interpretation of a similar statute see

*State v. Berge,* 25 Wash.App. 433, 607 P.2d 1247 (1980).

**11.** The instruction need not be given unless requested in the manner provided by V.A.M.R. Crim. Rule 20.02. MAI–CR 3.30.1, Notes on Use.

*v. Hayes*, supra, 347 N.E.2d at 329; " 'of such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses, and render his mind incapable of forming any sane design' ", *State v. Turley*, 113 R.I. 104, 318 A.2d 455, 459 (1974); "incapable of consciousness that he is committing a crime; incapable of discriminating between right and wrong–stupefaction of the reasoning faculty", *Green v. State*, 342 So.2d 419, 421 (Ala.Cr.App.1977).

■ Until a defendant has introduced some evidence of the required degree of intoxication the issue need not be submitted to the jury. *Mock v. State*, supra, 237 A.2d 811; *Harrell v. State*, 593 S.W.2d 664 (Tenn.Cr.App.1979); *State v. Verhasselt*, supra, 266 N.W.2d 342. "The issue referred to is not submitted to the trier of fact unless supported by the evidence." § 556.-051(1). However, when submitted, "any reasonable doubt on the issue requires a finding for the defendant on that issue." § 556.051(2).

■ In determining whether or not such reasonable doubt exists the jury may consider all relevant factors. These factors include not only the testimony of the defendant, but evidence of his conduct before the act, the act itself, and his subsequent conduct. *People v. Hunter*, supra, 303 N.E.2d 482; *Staples v. State*, 74 Wis.2d 13, 245 N.W.2d 679 (1976). Of particular importance is the conduct of a defendant in attempting to justify, excuse or conceal his act. Also very relevant is a defendant's ability to recount the circumstances surrounding the act and the act itself. *People v. Williams*, 14 Ill.App.3d 789, 303 N.E.2d 585 (1973).

■ It is true the defendant was intoxicated. However, the fact the defendant did not remember hitting Ted with the iron pipe is not conclusive that in his numbed condition he did not form an intent to kill. It is also true that his conduct after the act was bizarre. However, this factor is not conclusive; in fact this conduct could have been contrived so as to bolster the asserted defense. While the neighbor testified the defendant did not know what was going on around him, the jury could reject that evidence and accept the testimony of the officers that he was coherent, responsive, understandable, and knew what was going on around him. There had been a quarrel and the defendant used a ¾-inch iron pipe, rather than the light vacuum cleaner tube. Of great significance was the defendant's attempt to forestall an investigation of the shed when he told the officers that Ted wasn't there. Of equal importance was his acknowledgment of his act by his statement that Ted was the first person he ever murdered and that in his formal statement he recounted the act and events before and after that act. There was evidence upon which the jury could find that beyond a reasonable doubt the defendant's intoxication did not prevent him from intending to kill Ted and his first point is denied. Compare *People v. Pickerel*, 32 Ill.App.3d 822, 336 N.E.2d 778 (1975).

The defendant's second point is that the trial court erred in failing to suppress evidence of his verbal admissions and written statements. The basis of this contention is that because of his physical condition (sleeplessness and fatigue) and his intoxication those admissions and statements were not voluntary. When the defendant was arrested he was given the *Miranda* warning. He was taken to the Springfield Police Station. While waiting in the booking room in the company of an officer, smoking a cigarette, "[h]e suddenly blurted out that that was the first person he'd ever murdered." Shortly thereafter another officer entered the room, again gave the defendant the *Miranda* warning, and asked the defendant several questions. Among the responses were the statements that he had used a pipe on Ted and that he had done society a favor as Ted was a devil worshiper. At 3:36 a. m. still a different officer prepared to take a formal statement from the defendant. The *Miranda* warning was again given. However, the defendant placed his head on the table and appeared to go to sleep. The taking of the statement was discontinued and the defendant was returned to his cell.

At 8:50 a. m. the latter officer again gave the defendant the *Miranda* warning and took from him a formal statement which was transcribed and signed by the defendant. The statement gives some of the background of the event and the fact that the defendant picked up a ¾–inch water pipe and started hitting Ted.

The defendant testified he did not remember making the oral admissions. He did remember giving the statement at 8:50 a. m. He said he gave that statement because, "Well, I wanted to be left alone and I wanted to talk to somebody and tell them, you know, that I was responsible for what happened so they wouldn't go looking for any of my friends or something. Maybe accidently shoot one of them or something, thinking maybe somebody else did it." Concerning his condition at the time of the statement he said: "I wasn't intoxicated." The testimony concerning the defendant's condition at the scene has already been set forth. In addition, the officers testified that at the time of the oral admissions the defendant was intoxicated, was tired, but knew what was going on, was responsive to the questions and was coherent. In respect to the statement, the officer testified the defendant was tired, but that he said he understood his rights, he understood the questions, was responsive and coherent.

 The law in regard to the defendant's second point is well settled.

The general principle upon which courts are agreed is that intoxication at the time of making a statement or confession does not, at least where the intoxication, in the words of some cases, does not amount to mania, require that the statement be excluded because it is involuntary or not made knowingly and intelligently. Rather, the fact of intoxication goes to the weight and credibility to be accorded the statement. *State v. Heather*, 498 S.W.2d 300, 304 (Mo.App.1973). Also see *State v. Trask*, 581 S.W.2d 417 (Mo.App.1979); *State v. Easley*, 515 S.W.2d 600 (Mo.App.1974). The trial court found the first admission was volunteered and that in respect to all of the admissions and

the statement the defendant did understand what was being said to him and was able to respond appropriately and that the admissions and statements were admissible. Neither the trial court or the jury was required to accept any evidence to the contrary and the determination of the trial court was supported by the evidence. *State v. Hindman*, 543 S.W.2d 278 (Mo.App.1976). The defendant's second point is denied and the judgment is affirmed.

BILLINGS, P. J., concurs in separate opinion.

HOGAN, J., concurs in principal opinion and separate opinion.

BILLINGS, Presiding Judge (concurring).

I concur fully in the principal opinion. The thought provoking and exhaustive analysis of the serious and broad scope of the questions posed by the enactment of § 562.076 RSMo 1978, by the General Assembly of Missouri makes one wonder if the legislature fully considered the impact of such a statute on criminal prosecutions in this State. As Judge Maus notes, the courts of this country are in disagreement as to which crimes involve a specific intent and the effect to be given to voluntary intoxication or voluntary drugged condition. By injecting the issue of intoxicated or drugged condition into the case, the defendant in a criminal case casts the burden upon the State to prove beyond a reasonable doubt that his voluntary condition negated his "specific" intent. This in turn will call into question the sufficiency of the evidence of the requisite intent of the defendant and whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. den.* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126. Notwithstanding the problems of finality and federal–state comity, a single federal judge may ultimately rule this issue in federal habeas corpus. *Jackson v. Virginia*, supra.

Somewhere along the path of enlightenment in the field of criminal law the rights

of society have been cast by the wayside and § 562.076 is a further step in that direction.