STATE of Missouri, Respondent,

v.

**Michael J. ADKINS, Appellant.**

**No. WD 34654.**

Missouri Court of Appeals,
Western District.

Aug. 14, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled
and Denied Oct. 2, 1984.

Application to Transfer Denied
Nov. 20, 1984.

William M. Barvick, Jefferson City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Robert L. Swearingen, Asst. Atty. Gen., for respondent.

Before TURNAGE, C.J., and DIXON, and CLARK, JJ.

TURNAGE, Chief Judge.

Michael J. Adkins was found guilty by a jury of burglary in the second degree pursuant to § 569.170, RSMo 1978[1] and possession of burglar's tools pursuant to § 569.180. The jury sentenced Adkins to five years on each count. The court found Adkins to be a persistent offender and sentenced him to fifteen years on the burglary count and ten years on the possession of burglar's tools count, the sentences to run concurrently.

On this appeal, Adkins contends he should have been granted a change of venue; certain veniremen should have been stricken for cause; the sentencing judge was not authorized to sentence him because he had neither tried the case nor read the transcript; he was entitled to a continuance which was denied; a flashlight and gloves are not burglar's tools; and he was entitled to an instruction on intoxication as a defense. Affirmed.

On December 22, 1980, at about 5:45 p.m., Florence Bales was away from her Jefferson City home. She had equipped the house with a Sonitrol Security Compa-

---

1. All sectional references are to Missouri's Revised Statutes, 1978.

ny system which consisted of microphones which transmitted sound to the Sonitrol office. In addition, the exterior doors were equipped with devices to alert the Sonitrol office when a door was opened.

On the evening in question, a Sonitrol employee detected noise from the Bales' home of someone battering a door. Shortly thereafter, the employee received a signal indicating the basement door had been opened. The Sonitrol employee, Don Kratley, notified the Jefferson City Police Department and started toward the Bales' residence in a company vehicle. Kratley was in touch with the Sonitrol office while en route and learned that police officers had already arrived at the Bales' home. Kratley noticed the police cars when he arrived, but he did not observe any police officers as he approached the front door. Kratley heard the storm door of the Bales' home close and immediately shined his flashlight toward the front door where he saw a man. Kratley identified himself and the man immediately started running. Kratley pursued the fleeing man and was able to keep him in sight while the two traversed most of the neighborhood and a nearby city park. Eventually, Kratley was able to convince the man to return to the Bales' home where a police officer arrested him. Kratley testified that the man, later identified as Adkins, dropped a flashlight and a pair of gloves during the chase.

Adkins testified that on the afternoon in question he had been drinking with a friend, and the two then drove to the Bales' residence. They found no one at home. Adkins testified that his friend suggested they break in, but Adkins stated he did not want to do this. Adkins testified that he remained in the car while the friend went to accomplish the break in, and a short time later observed two police cars arrive at the Bales' home. Adkins stated that because he had a criminal record, he did not want the police to find him, so he sat in the front seat trying to decide what to do. Adkins finally decided to get out of the car and walk down the sidewalk. He testified that as he did so, he was accosted by a man with a gun who threatened to shoot him. Adkins stated that he took off running with the man in pursuit. Adkins later learned he had been pursued by Kratley.

■ Adkins first contends that the court erred in refusing to grant his motion for a change of venue. The trial was held on April 28, 1981, and at that time there was no Rule in effect governing change of venue. The only provision for change of venue was § 545.490. That section provides that in counties with less than 75,000 inhabitants, a change of venue shall be granted if the petition was supported by the affidavits of five or more credible, disinterested citizens residing in different neighborhoods of the county where the action is pending. At the time of the trial, the population of Cole County was less than 75,000. Official Manual of the State of Missouri 1981–82, at 1160. Adkins' petition was supported by five affidavits, however, two of the affiants listed their address as Route 2, Jefferson City, one affiant listed a street address in Jefferson City, and two affiants both listed the same street address and apartment number in Jefferson City. It is apparent that the five affiants did not live in different neighborhoods of Cole County. In *State v. Bradford*, 314 Mo. 684, 696, 285 S.W. 496, 500[6, 7] (Mo.1926), the court held that the five persons who sign the affidavits must reside in different neighborhoods so that the proof furnished by the affidavits will be co-extensive with the boundaries of the county. The court held that it was not error for the trial court to refuse the application for change of venue where the five persons who signed the affidavits did not live in different neighborhoods. *Id.* at 697, 285 S.W. at 500[6, 7]. The affidavits in this case show on their face that the five persons did not live in different neighborhoods. Although the trial court assigned the wrong reason for its refusal of the change of venue, its action was correct.

■ Adkins next contends that the court should have sustained his challenge to

strike for cause veniremen Daniel, Ott, Kleene, and Kolb. Although each of these veniremen had said that he had heard of Adkins and had heard him discussed, all said they had formed no opinion about the pending case. None of them expressed any reservation about his ability to listen to the evidence and impartially decide the case. There is no indication of any ground on which the court could have sustained a challenge for cause to any of these veniremen. Although the trial court is vested with sound discretion in ruling on a challenge for cause, *State v. Ealy*, 624 S.W.2d 490, 493[8, 9] (Mo.App.1981), the court had no occasion to exercise its discretion because the above-mentioned veniremen did not state any grounds which would put their qualification to sit as jurors in question. Adkins also contends that the court should have stricken the entire jury panel but no grounds were shown to require such action.

■■■ Adkins also contends that the sentencing judge was without authority to impose a greater sentence than the jury recommended because he had neither heard the evidence at the trial nor reviewed a transcript of the trial. After the jury returned its verdict, Judge Kinder disqualified himself and Judge Seier was assigned to take over the case. Judge Seier found Adkins to be a persistent offender and increased the sentence as above noted. Adkins does not contend any insufficiency in the finding that he was a persistent offender but confines his attack to Judge Seier's failure to read the trial transcript prior to pronouncing sentence. Adkins argues that *State v. Tettamble*, 450 S.W.2d 191 (Mo. 1970), requires a judge who did not preside over the trial to have read the trial transcript prior to pronouncing sentence. In *Tettamble* the judge pronouncing sentence had the trial record before him, however, that case did not adopt a per se rule that a sentencing judge who did not hear the case must have read the trial transcript before pronouncing sentence. *Tettamble* does es-

tablish the principle that a judge different from the one who heard the evidence before a jury can pronounce sentence. Adkins simply does not cite any authority that Judge Seier was required to read a transcript of the trial before he would have authority to pronounce sentence.

In this case Judge Seier presided at a hearing on a motion for new trial which consumes some 73 pages of transcript covering many of the aspects of this case. There is no indication from the record that Judge Seier was not adequately familiar with the facts of this case to perform the sentencing functions. In addition, he was presented with the evidence of Adkins' prior convictions, and those convictions supported the finding that Adkins was a persistent offender, thereby justifying the increased sentence.

■■■ Adkins next contends that the court should have granted his oral motion for a continuance made on the day of trial. Adkins does not demonstrate any prejudice by reason of the denial of the continuance and none is discerned from the record. The denial of a continuance is an exercise of the court's sound discretion. *State v. Newton*, 637 S.W.2d 805, 808[7, 8] (Mo.App. 1982). No abuse of discretion is shown.

■■■ Adkins contends that the court should have given his instruction on intoxication as a defense patterned after MAI–CR2d 3.30.1. *State v. Gullett*, 606 S.W.2d 796, 805–06[3] (Mo.App.1980), fully explored the degree of intoxication the evidence must reveal before an instruction on that subject need be submitted to the jury. The cases *Gullett* reviewed reveal that the intoxication must be to such a degree that the person is not capable of entertaining the specific mental intent required for the crime charged. *Id.* Adkins testified he had been drinking and was drunk when he was in the vicinity of the Bales' home. He further denied that he had broken into or was ever inside the Bales' home. Thus, the intoxication instruction was completely in-

consistent with his defense that he had committed no crime. Furthermore, the evidence does not show that Adkins was intoxicated to the degree required to give the instruction. He testified that he saw the police cars arrive, knew of his prior criminal record, and knew that he did not want to encounter the police. This certainly does not show a degree of intoxication that would render him incapable of entertaining the specific mental intent to commit the burglary. The court properly refused the intoxication instruction.

■ Finally, Adkins contends that the court erred in giving an instruction which authorized conviction for possession of burglar's tools if the jury found that Adkins was in possession of a screwdriver, a pair of gloves, or a flashlight. Adkins first contends that the evidence was insufficient to prove that he had possession of the screwdriver. Kratley testified that the screwdriver was found beside a tree where Adkins had paused for about thirty or more seconds during the chase. It is not necessary to determine the sufficiency of the evidence on this point because MAI–CR2d 23.54 requires the instruction to briefly state or enumerate the tools or instruments which were in a defendant's possession and provides that conviction is authorized if the jury finds that the defendant was in possession of one or more of such articles. The evidence clearly showed that Adkins was in possession of a flashlight and a pair of gloves at the time he came out of the house, and Adkins does not challenge the sufficiency of the evidence as to those two items. Because the instruction authorizes a conviction if the jury finds one or more of the listed items to be in Adkins' possession, it is immaterial whether the evidence as to possession of the screwdriver is insufficient.

Adkins further contends, however, that the pair of gloves and flashlight cannot qualify as burglar's tools because they are not "breaking" tools. Adkins relies on cases decided prior to the passage of § 569.180, which became effective January 1, 1979. That section provides:

1. A person commits the crime of possession of burglar's tools if he possesses any tool, instrument or other article adapted, designed or commonly used for committing or facilitating offenses involving forcible entry into premises, with a purpose to use or knowledge that some person has the purpose of using the same in making an unlawful forcible entry into a building or inhabitable structure or a room thereof.

That section is patterned after § 140.35 of the New York Penal Code. In *People v. Benoit,* 8 A.D.2d 626, 185 N.Y.S.2d 622, 624[1] (1959), the defendant had a flashlight and gloves in his possession, along with other tools. Counsel in that case conceded that the tools were adapted and could be used for the commission of burglary. *Id.* In *People v. Gastiaburo,* 23 A.D.2d 891, 260 N.Y.S.2d 250, 251 (1965), the court held that toothpicks qualified as implements commonly used for the commission of larceny. The toothpicks were used to prevent the owner from unlocking his apartment door while the larceny was being committed within. *Id. Cf. People v. Ray,* 3 Ill.App.3d 517, 278 N.E.2d 170 (1972), *rev'd on other grounds,* 54 Ill.2d 377, 297 N.E.2d 168 (1973).

■ The legislative intent is to be determined from the language used in the statute and to take the statute's words in their plain and ordinary meaning. *Rotary Drilling Supply, Inc. v. Director of Revenue,* 662 S.W.2d 496, 499[1] (Mo. banc 1983).

■ Under the plain language of § 569.180 it is not necessary that the tools be "breaking" tools but only that they be adapted, designed, or commonly used for committing or facilitating offenses involving forcible entry into premises. Facilitating means "to make easier or less difficult." Webster's Third New International Dictionary 812 (1971). It requires no imagination to hold that a flashlight and gloves

can facilitate the forcible entry into a building. A flashlight, of course, enables the person to see in the dark, and gloves can certainly eliminate fingerprints as well as assist in using tools and other means of forcing entry. In accordance with the New York cases based on a statute with wording similar to § 569.180, this court holds that a flashlight and a pair of gloves can qualify as burglar's tools because they are commonly used to facilitate the forcible entry into premises.

█ Section 569.180 requires proof of: (1) possession by the defendant of any of the tools mentioned, (2) adaptability, design or common use of the tools for committing or facilitating offenses involving forcible entry into premises, and (3) circumstances evincing an intent to use or employ, or allow the same to be used or employed, in the commission of an unlawful forcible entry into a building or inhabitable structure, or knowing that the same are intended to be so used.

█ The evidence was that Adkins broke into the house and was in possession of the gloves and flashlight. This satisfies the requirement that the items be in his possession with the intent to use them in the commission of an unlawful forcible entry. The jury was correctly informed that a flashlight and gloves could be burglar's tools because they are tools commonly used to facilitate the forcible entry into a building or inhabitable structure.

The judgment is affirmed.